633 N.W.2d 339 (2001)
PEOPLE of the State of Michigan, Plaintiff-Appellee,
v.
Todd Lamar MAFFETT, Defendant-Appellant.
Docket No. 115185, COA No. 219840.
Supreme Court of Michigan.
July 18, 2001.
On order of the Court, leave to appeal having been granted and this case having been briefed and argued by the parties, we VACATE the order of July 20, 2000 which granted leave to appeal and leave to appeal is DENIED because we are no longer persuaded the questions presented should be reviewed by this Court.
*340 CORRIGAN, C.J. (dissenting).
Defendant pleaded guilty to one count of possession with intent to deliver cocaine in an amount of 50 grams or more, but less than 225 grams, M.C.L. § 333.7401(2)(a)(iii). Before entering his plea, defendant moved to dismiss the charges on the ground that he had been entrapped into committing the alleged offenses. After an entrapment hearing, the trial court denied defendant's motion to dismiss. The Court of Appeals thereafter denied defendant's application for leave to appeal. We then granted defendant's application for leave to appeal. 462 Mich. 919. Today, after the case has been argued and submitted for decision, we vacate the order granting leave and deny defendant's application. Because I would resolve the case on its merits, I respectfully dissent.
The current state of Michigan law regarding the entrapment defense is unclear. See People v. Juillet, 439 Mich. 34, 475 N.W.2d 786 (1991) (setting forth alternative views in separate opinions by Justices BRICKLEY, CAVANAGH, AND BOYLE); People v. Fabiano, 192 Mich.App. 523, 482 N.W.2d 467 (1992) (attempting to ascertain the majority rule of Juillet). This case presents an opportunity to set forth a clear statement of the law. Having examined the legal foundations of the entrapment defense, I would hold that the judicial branch lacks authority to implement the defense. The proper role of the courts in our tripartite system of government is to ascertain and apply the law to resolve disputes; it is not to promulgate rules of substantive criminal law such as the entrapment defense. Our continued recognition of the entrapment defense thus amounts to an unconstitutional usurpation of legislative and executive power. If there is to be a legally valid entrapment defense in Michigan, it must be enacted by the Legislature. For the reasons set forth in this dissent, I would abrogate the entrapment defense and affirm the judgment of the Eaton Circuit Court.

I. THE ORIGINS OF THE ENTRAPMENT DEFENSE
The entrapment defense developed in the United States in the late nineteenth and early twentieth centuries.[1] The prevailing view in the nineteenth century was that government inducement provided no defense to a criminal charge.[2] A number *341 of state courts condemned the practice of entrapment (i.e., government-manufactured crime), but "few actually held that the entrapment entitled the defendant to an acquittal." Marcus, The development of entrapment law, 33 Wayne L. R. 5, 11 (1986). The criticism of government inducement generally occurred in obiter dictum. See Woo Wai v. United States, 223 F. 412, 415-416 (C.A.9, 1915) (citing six state cases from 1878-1910); Barlow, Entrapment and the common law: Is there a place for the American doctrine of entrapment?, 41 Mod. L. R. 266, 269 (1978).
In 1879, the Texas Court of Appeals held, for the first time ever, that an entrapped defendant could not be convicted of the charged crime. See O'Brien v. State, 6 Tex.App. 665 (1879). In O'Brien, the defendant had been convicted of bribery for attempting to pay a sheriff's deputy for a prisoner's release from the jailhouse. The parties disputed whether the defendant or the deputy first suggested the idea for the bribe. The trial court instructed the jury that this fact was irrelevant, as long as the defendant eventually agreed to pay a bribe. The Texas Court of Appeals reversed, explaining that it would be "not within the spirit" of the bribery statute to convict the defendant of bribery if the deputy originated the criminal intent and joined the defendant in the commission of the crime "merely to entrap the defendant." Id. at 668. The court also observed that it was unable to find "any adjudicated case" in support of its holding. Id.
Thirty-six years later, the Ninth Circuit Court of Appeals became the first federal court to bar a criminal conviction on grounds of entrapment in Woo Wai, supra.[3] Relying on O'Brien, and on dicta from five other state cases, the court explained that "a sound public policy can be upheld only by denying the criminality of those who are thus induced to commit acts which infringe the letter of the criminal statutes." Woo Wai, supra at 415. Most remaining federal circuits soon after recognized some form of the entrapment defense. See Sorrells v. United States, 287 U.S. 435, 443, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (citing cases). One representative case of the era, Butts v. United States, 273 F. 35, 38 (C.A.8, 1921), provided the following rationale for the doctrine:
The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. Here the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief endeavor was to cause, to create, crime in order to punish it, and it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it.
The early entrapment cases demonstrate that entrapment was not a traditional common-law justification or excuse defense based on the defendant's culpability. Rather, it arose from the burgeoning idea that punishing defendants for criminal violations "manufactured" by the government *342 was offensive to public policy (or, in the case of O'Brien, supra, offensive to the "spirit" of the criminal law).
II. SEEKING A LEGAL FOUNDATION-THE DEVELOPMENT OF THE ENTRAPMENT DEFENSE IN THE UNITED STATES SUPREME COURT
Two rival theories dominate the law of entrapment today. The federal courts and a majority of states have adopted the "subjective" view of entrapment. The subjective view focuses primarily on the defendant's "disposition" before the offense. The Model Penal Code, most legal commentators, and a minority of states favor the "objective" view of entrapment. The objective view focuses primarily on the nature of the police conduct before the crime.[4] Each theory has its genesis in Sorrells, supra, the first United States Supreme Court decision to adopt the entrapment defense. The majority opinion in Sorrells, authored by Chief Justice Hughes, set forth the theoretical basis for the subjective view. A separate opinion of Justice Roberts did the same for the rival objective view. The merits of their respective positions were again considered in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), and United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

A. SORRELLS V. UNITED STATES

The defendant in Sorrells sold contraband liquor to an undercover prohibition agent posing as a tourist. The agent visited the defendant at the defendant's home while "accompanied by three residents of the county who knew the defendant well." Id. at 439, 53 S.Ct. 210. The agent and the defendant were both veterans of the First World War and former members of the same military division. Although the defendant rebuffed the agent's initial requests for liquor, he eventually agreed to procure some after the conversation turned to reminiscences of the war.
The trial court refused to allow the jury to consider the defense of entrapment. The defendant was convicted for possessing and selling whisky in violation of the National Prohibition Act. Conceding that the "weight of authority in the lower federal courts" suggested that the defense of entrapment should have been available to the defendant under the circumstances, the Solicitor General argued that entrapment was an invalid defense because its application required the judicial branch to disregard violations of the criminal statutes enacted by the legislative branch. Id. at 443-446, 53 S.Ct. 210.
The Sorrells Court answered this contention by explaining that, although the defendant's conduct brought him within the "letter" of the criminal statute, sustaining his conviction would "do violence to the spirit and purpose" of the provision. Id. at 446-448, 53 S.Ct. 210. Relying on the "absurd results" method of statutory construction,[5] the Court opined that Congress, *343 in enacting the statute at issue, could not have intended for its literal provisions to apply to "otherwise innocent" persons lured into committing statutorily proscribed acts by government officials. Id. at 451, 53 S.Ct. 210. The Court also explained that "[t]he predisposition and criminal design of the defendant are relevant" considerations in entrapment cases, because the "controlling question" is "whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials." Id. On the basis of this test, the majority concluded that the trial court erred in refusing to submit the issue of entrapment to the jury.
Justice Roberts, joined by Justices Brandeis and Stone, agreed that the defendant's conviction should have been reversed, but disagreed with the majority's "implied congressional intent" rationale. Justice Roberts found the "true foundation of the [entrapment] doctrine in the public policy which protects the purity of government and its processes." Id. at 455, 53 S.Ct. 210. The doctrine of entrapment, he reasoned, was simply a criminal law analogy to the civil doctrines by which "courts refuse their aid" to the "perpetration and consummation of an illegal scheme." Id. at 455, 53 S.Ct. 210. Justice Roberts further accused the majority of simply inventing a "new method of rationalizing the defense" and engaging in "judicial legislation." Id. at 455, 458, 53 S.Ct. 210. In his view, the majority rule required a "strained and unwarranted construction of the statute." Acknowledging that an entrapped defendant "falls within the letter of the law" and is thus rendered "amenable to its penalties," Justice Roberts concluded that courts nevertheless retain the "inherent right" to protect themselves from the "prostitution of the criminal law." Id. at 456-457, 53 S.Ct. 210. Given this view, he suggested that the power of finding entrapment should be held by the court rather than the jury.
Justice Roberts also criticized the majority's focus on the defendant's disposition:
To say that [instigation and inducement of a crime] by an official of government is condoned and rendered innocuous by the fact that the defendant had a bad reputation or had previously transgressed is wholly to disregard the reason for refusing the processes of the court to consummate an abhorrent transaction. It is to discard the basis of the doctrine and in effect to weigh the equities as between the government and the defendant when there are in truth no equities belonging to the latter, and when the rule of action cannot rest on any estimate of the good which may come of the conviction of the offender by foul means. The accepted procedure, in effect, pivots conviction in such cases, not on the commission of the crime charged, but on the prior reputation or some former act or acts of the defendant not mentioned in the indictment. [Id. at 459, 53 S.Ct. 210.]
Concluding that the defendant had been entrapped as a matter of law, Justice Roberts opined that the case should be remanded to the district court with instructions to quash the indictment and discharge the defendant.
Responding to Justice Roberts, the majority explained that the proper function of a court is to construe a statute, not to "defeat" a statute "as construed." Id. at *344 449, 53 S.Ct. 210. Allowing a court to "refuse to try a case" where the defendant's conduct falls within the applicable statute, because the court "desires to let the defendant go free," would interfere with the executive authority to "seek to proceed with the prosecution" and the legislative authority to define illegal conduct. Id. at 449-450, 53 S.Ct. 210. "Judicial nullification of statutes, admittedly valid and applicable, has, happily, no place in our system." Id. at 450, 53 S.Ct. 210. Finally, the majority rejected Justice Roberts' analogy to civil and equitable doctrines:
Suggested analogies from procedure in civil cases are not helpful. When courts of law refuse to sustain alleged causes of action which grow out of illegal schemes, the applicable law itself denies the right to recover. Where courts of equity refuse equitable relief because complainants come with unclean hands, they are administering the principles of equitable jurisprudence governing equitable rights. But in a criminal prosecution, the statute defining the offense is necessarily the law of the case. [Id. at 450, 53 S.Ct. 210.]

B. SHERMAN V. UNITED STATES

Twenty-six years later, in Sherman, supra, the Court reaffirmed the approach taken by the Sorrells majority. The majority in Sherman did not undertake a critical analysis of the Sorrells rationale, but rather rested its decision on prudential and stare decisis grounds.[6] Reiterating the importance of the predisposition inquiry, the Court explained that "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." Id. at 372, 93 S.Ct. 1637. As in Sorrells, a significant group of justices offered a different view of the entrapment defense.
Justice Frankfurter, joined by Justices Douglas, Harlan and Brennan, filed a separate opinion built on the foundation laid by Justice Roberts in Sorrells. The separate opinion criticized as "sheer fiction" the "implied legislative intent" theory underlying the majority rule. Sherman, supra, at 379, 78 S.Ct. 819. It next repeated Justice Roberts' policy attack on the majority view, suggesting that a defendant's past crimes should not "forever outlaw the criminal and open him to police practices, aimed at securing his repeated conviction, from which the ordinary citizen is protected." Id. at 383, 78 S.Ct. 819.
More importantly, Justice Frankfurter suggested a specific source of the Court's authority to regulate objectionable police conduct. In his view, the only legitimate basis for enforcing the entrapment defense was the Supreme Court's "supervisory jurisdiction over the administration of criminal justice." Id. at 380-381, 78 S.Ct. 819. He opined that when courts refuse to convict an entrapped defendant, they do so as an "exercise of a recognized jurisdiction to formulate and apply `proper standards for the enforcement of the federal criminal law in the federal courts.'" Id. at 380, 78 S.Ct. 819, quoting McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 87 L.Ed. 819 (1943).[7] The formulation of *345 such standards, he reasoned, "does not in any way conflict with the statute the defendant has violated, or involve the initiation of a judicial policy disregarding or qualifying that framed by Congress," because Congress enacts criminal statutes with the presupposition that the courts will formulate the requisite standards for the "administration of criminal justice." Sherman, supra at 381, 78 S.Ct. 819. Thus, a "false choice is put when it is said that either the defendant's conduct does not fall within the statute or he must be convicted." Id.
Finally, Justice Frankfurter proposed a specific, objective standard for identifying when entrapment occurs. Under his test, the police should "act in such a manner as is likely to induce to the commission of crime" only those persons "ready and willing to commit further crimes should the occasion arise" and "not others who would normally avoid crime and through selfstruggle resist ordinary temptations." Id. at 383-384, 78 S.Ct. 819. This standard, he reasoned, "draws directly on the fundamental intuition that led in the first instance to the outlawing of `entrapment' as a prosecutorial instrument." Essentially, "the power of government is abused" when "employed to promote rather than detect crime." Id. at 384, 78 S.Ct. 819.

C. UNITED STATES V. RUSSELL

The next major decision from the United States Supreme Court came in 1973. In Russell, supra, an undercover officer investigating the defendant for illegally manufacturing the drug methamphetamine supplied the defendant with an essential ingredient for producing the drug. The necessary ingredient, although difficult to obtain, was itself harmless and legal. Using the ingredient supplied by the officer, the defendant manufactured and sold methamphetamine. A jury rejected the defendant's entrapment defense, but the Ninth Circuit reversed on due process grounds after finding "an intolerable degree of governmental participation in the criminal enterprise." Id. at 427, 93 S.Ct. 1637.
The Supreme Court reversed, concluding that the police officer's act of providing the harmless ingredient to gain the defendant's confidence was not a due process violation but rather a "permissible means of investigation." Id. at 432, 93 S.Ct. 1637. Responding to the defendant's contention that the Court should apply an exclusionary rule to bar police involvement in criminal activity, the Court explained that the government's conduct "violated no independent constitutional right" of the defendant.[8]Id. at 430, 93 S.Ct. 1637. Although the Court rejected the defendant's due process argument, it did not foreclose the possibility that such a defense might exist on different facts:
While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the instant case is distinctly not of that breed. [Russell, supra at 431-432, 93 S.Ct. 1637.][9]
*346 The Court also rejected the defendant's contention that the "nonconstitutional defense of entrapment" should be broadened to mandate dismissal in all cases involving "overzealous law enforcement." Id. at 428, 432-433, 93 S.Ct. 1637. After reaffirming the longstanding rule of Sorrells and Sherman, the Court explained that the entrapment defense "was not intended to give the federal judiciary a `chancellor's foot' veto over law enforcement practices of which it did not approve."[10]Russell, supra at 435, 93 S.Ct. 1637. A contrary rule would improperly interfere with the authority of the executive branch to execute the federal laws.
Justice Douglas, joined by Justice Brennan, dissented. He opined that the defendant had been entrapped because the police officer was "an active participant in the unlawful activity." Id. at 437, 93 S.Ct. 1637. Without respect to the objective question whether the police conduct likely would have caused an otherwise innocent person to commit a crime, Justice Douglas reasoned that courts should not tolerate the conduct of officers who "become the instigators of the crime, or partners in its commission, or the creative brain behind the illegal scheme." Id. at 439, 93 S.Ct. 1637.
Justice Stewart, joined by Justices Brennan and Marshall, dissented separately. He advocated the objective view of entrapment espoused by Justices Roberts and Frankfurter in Sorrells and Sherman. Regarding congressional intent purportedly underlying the majority rule of Sorrells, Justice Stewart opined: "I find it impossible to believe that the purpose of the defense is to effectuate some unexpressed congressional intent to exclude from its criminal statutes persons who committed a prohibited act, but would not have done so except for the Government's inducements." Russell, supra, at 441-442, 93 S.Ct. 1637. Justice Stewart questioned how an entrapped defendant, who has "by definition" committed the charged offense, could be accurately described as "otherwise innocent." He also wondered why a defendant "induced, provoked, or tempted" to commit an offense by the government would be "any more innocent or any less predisposed than he would be if he had been induced, provoked, or tempted by a private personwhich, of course, would not entitle him to cry `entrapment.'" Id. at 442, 93 S.Ct. 1637. Given this logical conundrum, Justice Stewart reasoned that the "purpose" of the entrapment defense must not be to protect "otherwise innocent" persons, but rather to "prohibit unlawful governmental *347 activity in instigating crime." Id. He then suggested that the subjective view's focus on "innocence or predisposition" unjustly caused the defendant's past criminal record to determine whether police conduct directed toward the defendant is permissible. Id. at 443-444, 93 S.Ct. 1637.
On the basis of these practical concerns, Justice Stewart endorsed an objective test for entrapment similar to that proposed by Justice Frankfurter in Sherman:
[G]overnment agents may engage in conduct that is likely, when objectively considered, to afford a person ready and willing to commit the crime an opportunity to do so.
But when the agents' involvement in criminal activities goes beyond the mere offering of such an opportunity and when their conduct is of a kind that could induce or instigate the commission of a crime by one not ready and willing to commit it, thenregardless of the character or propensities of the particular person inducedI think entrapment has occurred. For in that situation, the Government has engaged in the impermissible manufacturing of crime, and the federal courts should bar the prosecution in order to preserve the institutional integrity of the system of federal criminal justice. [Russell, supra at 445, 93 S.Ct. 1637 (citations omitted).]
As set forth below, Michigan's current "objective" entrapment test is based, primarily, on Justice Stewart's dissent in Russell.

III. ENTRAPMENT IN MICHIGAN

A. THE EARLY CASES
This Court first addressed the subject of entrapment in Saunders v. People, 38 Mich. 218 (1878). In Saunders, a police officer testified that the defendant, a lawyer, had asked him to leave a courtroom door unlocked to allow the defendant to obtain some papers. Apparently, after discussing the matter with a superior, the officer consented to the plan and then lay in wait. At 9:00 P.M., a different man was caught removing papers from a desk in the courtroom. Soon afterwards, the defendant was arrested in the vicinity of the courthouse.
The defendant was convicted of breaking and entering. This Court reversed the defendant's conviction and ordered a new trial on grounds that the trial court erred in preventing the defendant from asking the officer about certain past dealings relevant to his credibility as a witness,[11] and for excluding testimony from another witness that there was nothing unusual about the defendant being found in the vicinity of the courthouse. Because the officer's testimony was crucial, and his apparent role in "conniving at and assisting in the crime" put him in "an equivocal position," we reasoned that the jury should have had the benefit of all evidence affecting his credibility. Id. at 220.
In a concurring opinion, Justice MARSTON strongly condemned the actions of the police officers in securing the defendant's conviction:
The course pursued by the officers in this case was utterly indefensible. Where a person contemplating the commission of an offense approaches an officer of the law, and asks his assistance, it would seem to be the duty of the latter, according to the plainest principles of duty and justice, to decline to render such assistance, and to take such steps as would be likely to prevent the commission of the offense, and tend to the *348 elevation and improvement of the wouldbe criminal, rather than to his farther debasement. Some courts have gone a great way in giving encouragement to detectives, in some very questionable methods adopted by them to discover the guilt of criminals; but they have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing. The mere fact that the person contemplating the commission of a crime is supposed to be an old offender can be no excuse, much less a justification for the course adopted and pursued in this case. If such were the fact, then the greater reason would seem to exist why he should not be actively assisted and encouraged in the commission of a new offense which could in no way tend to throw light upon his past iniquities, or aid in punishing him therefor, as the law does not contemplate or allow the conviction and punishment of parties on account of their general bad or criminal conduct, irrespective of their guilt or innocence of the particular offense charged and for which they are being tried. Human nature is frail enough at best, and requires no encouragement in wrong-doing. If we cannot assist another and prevent him from violating the laws of the land, we at least should abstain from any active efforts in the way of leading him into temptation. Desire to commit crime and opportunities for the commission thereof would seem sufficiently general and numerous, and no special efforts would seem necessary in the way of encouragement or assistance in that direction. [Id. at 221-222.]
Chief Justice CAMPBELL also concurred separately. He characterized the police conduct as "scandalous and reprehensible."[12]Id. at 223. Despite the strong language in the concurring opinions, the Saunders decision did not adopt an entrapment defense.
Although this Court has occasionally expressed concern regarding "scandalous" police practices, such concern never benefitted criminal defendants. In People v. Liphardt, 105 Mich. 80, 62 N.W. 1022 (1895), for instance, this Court rejected the defendant's claim that he should be acquitted of bribery charges because he harbored no intention of committing the offense until being induced as part of a plan conceived by the Mayor of Detroit, aided by the police. In so doing, we explained unequivocally that inducement has no *349 bearing on criminal responsibility unless it negates an element of the offense:
We know of no case that holds that one who has committed a criminal act should be acquitted because induced to do so by another. It is merely when the criminality of the act is shown to be absent by the fact of the inducement that such proof justifies acquittal. In cases of alleged larceny, where the master has directed a servant to deliver his property to a thief, or burglary, where he has directed the admission of the burglar, the principal element of the offense is lacking; in the former there is no felonious taking, in the latter no felonious breaking and entering. [Id. at 83-84, 62 N.W. 1022. See also People v. Murphy, 93 Mich. 41, 45, 52 N.W. 1042 (1892) (involving a government sting).]
The principle that government inducement provided no defense to a criminal charge remained the law in Michigan well into the twentieth century. See, e.g., People v. England, 221 Mich. 607, 609, 192 N.W. 612 (1923); People v. McIntyre, 218 Mich. 540, 543, 188 N.W. 407 (1922).

B. RECOGNIZING AN ENTRAPMENT DEFENSE
Michigan first recognized the entrapment defense in 1941, in People v. Smith, 296 Mich. 176, 295 N.W. 605 (1941), and People v. Mitchell, 298 Mich. 172, 298 N.W. 495 (1941). In Smith, the defendant and a codefendant were convicted of conspiracy to defraud by false pretenses. Their plan was to sell "bogus stage paper" under the pretense that it was $1000 counterfeit currency. The police learned of the plan and arranged for its consummation through an informer. Defendant was arrested when he arrived to make the exchange. Id. at 178-179, 295 N.W. 605. The defendant argued that "the conviction must be set aside because entrapment by the police stripped the transaction of criminality."[13]Id. at 181, 295 N.W. 605.
We rejected the defendant's argument because the conspiracy had already been completed "before the local law enforcement authorities came into the picture." Id. at 182, 295 N.W. 605. There was no entrapment because the police merely "furnished opportunity or aid in furtherance of an already completed conspiracy in order to acquire more evidence." Id. We stated the following rule:
"[W]here the criminal intent originates in the mind of the defendant, the fact that the officers of the government used decoys or truthful statements to furnish opportunity for or to aid the accused in the commission of a crime, in order successfully to prosecute him therefor, constitutes no defense to such a prosecution." [Id. at 182, 295 N.W. 605, quoting Butts, supra at 37.]
Smith did not adopt an entrapment defense. We merely explained that the officers' act of furnishing the opportunity to gather additional evidence against the defendant did not allow for such a defense. Nevertheless, the negative implication of our holding was that a defendant who had been "inspired into crime by the police authorities" might have an entrapment defense of some sort. See id. at 182, 295 N.W. 605.
In Mitchell, the defendant was convicted of poisoning another person's drink with the intent to injure. She and her husband ran a rooming house in Detroit. A man named Gonzales passed out at the rooming house after being served a beer. When he awakened, he felt numb and was missing twelve dollars. Suspecting that he had *350 been drugged, he reported the incident to the police. The following day, Gonzales and a police officer returned to the defendant's rooming house, feigned intoxication, and purchased some beer. Chemical testing revealed that the beer contained chloral hydrate, also known as "knock-out drops." Id. at 173-177, 298 N.W. 495. The defendant's husband, a codefendant, testified that Gonzales told him that the officer had a lot of money and that he wanted to "get even" with him for something the officer had done to Gonzales and his sister. He further testified that Gonzales suggested that they drug the officer and take the money. Id. at 178, 298 N.W. 495.
The trial court instructed the jury on the defense of entrapment. On appeal, defendant argued that the trial court's entrapment instruction was erroneous.[14] The trial court's charge to the jury began with a general statement of law:
Members of the jury, I charge you, as requested: It is against public policy for officers of the law to induce the commission of criminal offenses. Therefore, when officers of the law, through their acts or conduct, or by what they say, induce or persuade a person to commit a criminal offense, an offender under such circumstances cannot be prosecuted. Therefore, if you find in this case that the officer induced these defendants or either of them to commit the offense charged, or did so through or with the aid of another person by prearrangement, assisting such officers, then your verdict must be not guilty. If there is a reasonable doubt in your minds as to whether or not these defendants did what you find from the evidence they did so [do?], if anything, through the inducement or persuasion of an officer of the law or anyone acting for such officer by agreement or understanding with him, then your verdict must be not guilty. [Id. at 183-184, 298 N.W. 495.]
The trial court then related some of the testimony bearing on the defendant's claim of entrapment. We found "no error" in the charge, and held that it "was as favorable to defendants as they were entitled to under the law." Id. at 185, 298 N.W. 495.
Our approval of the trial court's instruction in Mitchell marked this Court's first positive endorsement of the entrapment defense. The Mitchell formulation was based explicitly on "public policy," rather than any view of legislative intent. The formulation was subjective, however, because it focused on whether the defendant had actually been induced to commit the offense. Although Mitchell was released nine years after Sorrells, we expressed no comment on that landmark case. Notably, in our inaugural recognition of the entrapment defense, we made no attempt to explain the legal justification for the doctrine.

C. ADOPTING THE OBJECTIVE TEST
Over thirty years later, this Court formally adopted the objective test for entrapment in People v. Turner, 390 Mich. 7, 210 N.W.2d 336 (1973). We began the Turner opinion by noting Justice MARSTON'S strong condemnation of entrapment in Saunders (which we characterized as the origin of the entrapment defense) and the divergent views of the various United States Supreme Court justices in Sorrells, Sherman and Russell. See Turner, supra at 15-19, 210 N.W.2d 336, quoting People v. Sinclair, 387 Mich. 91, 116-120, 194 N.W.2d 878 (1972) (SWAINSON, J.). We then opined that Justice Stewart's dissenting view in Russell "persuasively" articulated "why the objective test should be *351 adopted in Michigan." Turner, supra at 19, 210 N.W.2d 336. After quoting much of Justice Stewart's dissenting opinion, we described the Michigan rule of entrapment as follows:
We agree with the position of Justices Roberts, Frankfurter, and Stewart of the United States Supreme Court and the view articulated by Justices MARSTON and CAMPBELL of our Supreme Court and adopt an objective test of entrapment in Michigan. [Turner, supra at 22, 210 N.W.2d 336.]
In People v. D'Angelo, 401 Mich. 167, 257 N.W.2d 655 (1977), this Court addressed some of the procedural mechanics of the entrapment defense. There, we described the nature of our entrapment defense as follows:
When an accused claims entrapment he is asserting, in essence, entitlement to the benefit of a judicial policy that his claim, if true, is a bar to the prosecution of the case. His claim does not involve an assessment of guilt or innocence and, in fact, is irrelevant to it. It is in that respect that the entrapment claim is unique and distinguishable from the more common defenses in criminal cases such as alibi, insanity, self-defense, lack of specific intent and the like, which assert the absence of one or more elements of the crime charged and involve therefore the assessment of guilt or innocence. The defense of entrapment is not interjected to establish the absence of an essential element of the crime but to present facts collateral or incidental to the criminal act which justify acquittal on the ground of an overriding public policy to deter instigation of crime by enforcement officers in order to get a conviction. [Id. at 179, 257 N.W.2d 655.]
Seventeen years after adopting the objective test, this Court considered, in People v. Jamieson, 436 Mich. 61, 65, 461 N.W.2d 884 (1990), whether to abandon that view in favor of the subjective view advocated by the majority opinions in Russell and Sorrells. In five separate opinions, none of which garnered a majority of the Court, we elected to adhere to the objective test.
The lead opinion in Jamieson, authored by Justice BRICKLEY and joined by Chief Justice RILEY and Justice BOYLE, began by noting what it described as the "overlap" between the objective and subjective tests for entrapment:
As a matter of practicality, in many instances the application of the two theories overlap. When applying the subjective test, to determine if the accused is predisposed, the court must consider the official's conduct. Predisposition is linked to the amount of inducement and pressure offered by an agent as well as how long the agent persisted before commission of the illegal act. Similarly, courts applying the objective approach use the state of mind of the accused as a factor. When applying the objective test, consideration is given to the willingness of the accused to commit the act weighed against how a normally law-abiding person would react in similar circumstances. Under either approach, courts adhere to the fact that the function of law enforcement is to deter crime and not to manufacture it. [Id. at 74, 461 N.W.2d 884.]
Justice BRICKLEY then observed that the "precise theoretical underpinnings [of the entrapment defense] have been difficult to discern" and that "each test has its flaws." Id. at 78, 461 N.W.2d 884. Given the "overlap" between the two tests and the problems associated with each test, Justice BRICKLEY found insufficient justification to abandon the objective entrapment test in Michigan.
*352 Justice CAVANAGH concurred in the result and with the lead opinion's adherence to the objective test for entrapment. He wrote separately because he did not agree with Justice BRICKLEY'S suggestion that a court applying the objective test should assess the state of mind of the accused. Under a proper understanding of the objective test, he explained, the defense of entrapment should be available even to persons ready and willing to commit the crime charged.[15]
Finally, Justice GRIFFIN opined separately that the defense of entrapment should be eliminated:
Unless police conduct in a given situation is so reprehensible as to violate constitutional standards imposed by the Due Process Clause, I do not believe that one who is guilty of committing a criminal act should be exonerated by the judiciary simply because it disapproves of conduct on the part of another branch of government. While constitutional limitations must be strictly observed, it is my view that the defense of entrapment, which has no constitutional base whatever, should be eliminated. [Id. at 98, 461 N.W.2d 884.]
One year later, this Court revisited the entrapment question in Juillet. Once again, a majority could not agree on a single statement of the law of entrapment. Justices BRICKLEY, joined by Justices RILEY and GRIFFIN, adhered to the objective test set forth in his Jamieson opinion.[16]Id. at 41, 59-60, 475 N.W.2d 786. Clarifying his view, Justice BRICKLEY explained that the unique circumstances of the particular defendant are relevant to whether the police conduct rose to a "reprehensible" level. He explained that the court should ask whether the police conduct would be likely to instigate crime by a hypothetical "normally law-abiding person" in the defendant's unique situation. See id. at 54-56, 475 N.W.2d 786. Finally, Justice BRICKLEY provided a nonexclusive list of factors for courts to consider, in addition to the defendant's situation, to determine whether police conduct amounted to entrapment. Id. at 57, 475 N.W.2d 786.
Justice CAVANAGH, joined by Justices LEVIN and MALLETT, filed a separate opinion supporting the objective test. Id. at 70-71, 475 N.W.2d 786. As in Jamieson, he disagreed with Justice BRICKLEY'S "focus on the character and circumstances" of the particular defendant in applying the objective test. Id. at 72, 475 N.W.2d 786. In addition to advocating a more traditional objective test for entrapment, he embraced the view advanced by Justice Douglas in Russell, supra at 439, 93 S.Ct. 1637, that certain "reprehensible" police conduct should not be tolerated by courts without respect to issues of causation. Juillet, supra, at 77, 475 N.W.2d 786. Finally, Justice CAVANAGH addressed the fundamental question regarding the "legal authority upon which courts have enforced the defense of entrapment." Id. at 84, 475 N.W.2d 786. After rejecting the legislative-intent justification and questioning the validity of the "inherent judicial supervisory power" justification, he opined that the objective entrapment defense adopted in Turner, was "necessarily rooted in the Due Process Clause of the Michigan Constitution." *353 Juillet, supra at 84-85, 475 N.W.2d 786.
In a separate opinion, Justice BOYLE provisionally aligned herself with Justice BRICKLEY'S version of the objective entrapment defense,[17] and indicated that she would also recognize a "reprehensible-conduct test for entrapment," although to a different degree than recognized by Justice CAVANAGH. Id. at 87, 475 N.W.2d 786. She then opined that the best policy would be to adopt a "dual view" incorporating both a subjective entrapment test and an objective reprehensible-conduct defense.[18] Justice BOYLE did not offer a particular legal justification for adopting a subjective entrapment test, but implicitly suggested that imposition of an objective reprehensible-conduct defense would be within the Court's supervisory authority. See id. at 94, 475 N.W.2d 786, citing Sherman, supra at 381, 78 S.Ct. 819 (Frankfurter, J., concurring in the result). Finally, Justice BOYLE expressly disassociated herself from Justice CAVANAGH'S assertion that "the entrapment doctrine is rooted in the Due Process Clause of the Michigan Constitution." Juillet, supra, at 109, n. 30, 475 N.W.2d 786.

IV. THE JUDICIALLY-CRAFTED ENTRAPMENT DEFENSE SHOULD BE ABROGATED
Although the justices of this Court have, over the years, expressed a variety of policy views and practical concerns regarding the entrapment defense, we have devoted little attention to identifying an appropriate legal foundation for the defense. Given the problems associated with the various theories of entrapment, we should now consider whether any such foundation exists. For the reasons set forth below, I would conclude that the entrapment defense, as it has developed in Michigan, lacks a valid legal foundation.

A. LEGISLATIVE INTENT
Assuming that an entrapped defendant has engaged in conduct constituting all the elements of a criminal offense, as defined by the Legislature, may we nevertheless conclude that the Legislature did not intend that the defendant be punished, because such punishment would be an "absurd result" contrary to the "spirit" of the statute?
This Court has never adopted the implied-legislative-intent view of entrapment advocated by the Sorrells majority. To the contrary, we twice expressly rejected that view. See Jamieson, supra; Turner, supra at 20, 210 N.W.2d 336, quoting Russell, supra at 442, 93 S.Ct. 1637 (Stewart, J., dissenting). Our rejection of the Sorrells implied-legislative-intent analysis is consistent with our general disapproval of the "absurd results" method of statutory construction. See People v. McIntire, 461 Mich. 147, 155-159, 599 N.W.2d 102 (1999). Where a conflict exists between the plain language of a statute and our perception of what the Legislature "must have" intended despite such language, this Court's duty is to apply the statute as written. Id. The correction of unwise policy choices is not a *354 judicial function, but rather "must be left to the people and the tools of democracy: the `ballot box, initiative, referendum, or constitutional amendment.'" McIntire, supra at 159, 599 N.W.2d 102, citing Dedes v. Asch, 446 Mich. 99, 123-124, 521 N.W.2d 488 (1994) (RILEY, J., dissenting).
Notwithstanding whatever "spirit" we might conjure from the underlying purposes of the penal code, I can discern no textual basis for concluding that the Legislature intended this Court to design and implement an entrapment defense. Instead, I agree with Justice Frankfurter's sensible observation in Sherman, supra at 379, 78 S.Ct. 819:
In these cases raising claims of entrapment, the only legislative intention that can with any show of reason be extracted from the statute is the intention to make criminal precisely the conduct in which the defendant has engaged. That conduct includes all the elements necessary to constitute criminality.
In my view, implied legislative intent simply does not provide a satisfactory legal justification for the entrapment defense.

B. INHERENT AUTHORITY AND THE SEPARATION OF POWERS DOCTRINE
Assuming that an entrapped defendant has committed an offense for which the Legislature intended criminal punishment, does this Court nevertheless possess the inherent authority to bar the criminal prosecution to ensure, as a matter of policy, that law enforcement officers adhere to appropriate standards of conduct?
By formally adopting the objective view of entrapment in Turner, supra at 22, 210 N.W.2d 336, as set forth by the minority views of Justices Roberts, Frankfurter and Stewart, this Court implicitly accepted the notion that courts possess the inherent authority to implement the entrapment defense as a matter of overriding public policy.
I would reject that view as well. It is readily apparent that Michigan courts lack the constitutional authority to create, out of whole cloth, substantive legal rules such as the entrapment defense. It is further apparent that, absent a valid legal rule establishing the entrapment defense, a court may not bar a criminal prosecution on the ground of entrapment. Such action would abdicate a court's constitutional duty to resolve cases according to the law and violate the separation of powers doctrine. See Const. 1963, art. 3, § 2.
Our state constitution expressly provides for the separation of powers between the three coequal branches of government.[19] Justice COOLEY described the doctrine as follows:
Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, while the third must see that the laws are executed. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others. [Sutherland *355 v. Governor, 29 Mich. 320, 324-325 (1874).]
The primary role of the judicial branch within our system of government is to resolve controversies by ascertaining and applying the law. E.g., Johnson v. Kramer Bros. Freight Lines, Inc., 357 Mich. 254, 258, 98 N.W.2d 586 (1959); Risser v. Hoyt, 53 Mich. 185, 193, 18 N.W. 611; Sutherland, supra at 324; see also Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Crafting new law is a legislative function, not a judicial function:
"There is a distinction between legislative and judicial acts. The Legislature makes the law-courts apply it. To enact laws is an exercise of legislative power; to interpret them is an exercise of judicial power. To declare what the law shall be is legislative; to declare what it is or has been is judicial. The legislative power prescribes rules of action. The judicial power determines whether, in a particular case, such rules of action have been transgressed. The Legislature prescribes rules for the future. The judiciary ascertains existing rights." [In re Manufacturer's Freight Forwarding Co., 294 Mich. 57, 63, 292 N.W. 678 (1940), quoting In re Consolidated Freight Co., 265 Mich. 340, 343, 251 N.W. 431 (1933) (POTTER, J., dissenting).][20]
The judicial power to ascertain and apply the law to resolve controversies is vested in the courts by Const. 1963, art. 6, § 1. By constitutional implication, courts also possess whatever ancillary powers are necessary to permit them to exercise their express judicial power. See, e.g., In re 1976 Pa. 267, 400 Mich. 660, 662-663, 255 N.W.2d 635 (1977); Gray v. Clerk of Common Pleas Court, 366 Mich. 588, 595, 115 N.W.2d 411 (1962); Anderson v. Dunn, 19 U.S. (6 Wheat) 204, 225, 5 L.Ed. 242 (1821). This implied judicial power includes the authority to regulate court procedure. See Jones v. Eastern Michigan Motorbuses, 287 Mich. 619, 645-646, 283 N.W. 710 (1939). This Court also possesses the express constitutional authority to establish general rules governing "practice and procedure in all courts of this state." Const. 1963, art. 6, § 5. Our rulemaking authority under Const. 1963, art. 6, § 5 extends only to matters that are truly procedural. We lack the authority to enact rules that are "procedural" in operation, but substantive in purpose or effect. McDougall v. Schanz, 461 Mich. 15, 27, 597 N.W.2d 148 (1999).
If the judicial branch has the inherent authority to implement the entrapment defense, it must be found within the implied judicial powers under Const. 1963, art. 6, § 1, or this Court's rulemaking authority under Const. 1963, art. 6, § 5.[21] We have not promulgated a general court rule regarding entrapment, and it is beyond peradventure to suggest that we would have the authority to do so. Michigan's entrapment defense is a matter of substantive law. The purpose of the defense is "to *356 prohibit unlawful government activity in instigating crime."[22]Turner, supra at 20, 210 N.W.2d 336, quoting Russell, supra at 442, 93 S.Ct. 1637 (Stewart, J., dissenting); see also D'Angelo, supra at 179, 257 N.W.2d 655. The regulation of law enforcement practices involved in the investigation and detection of crime falls within the police power of the legislative branch.[23] E.g. People v. Piasecki, 333 Mich. 122, 143, 52 N.W.2d 626 (1952); O'Dell v. Flint Civil Service Comm., 328 Mich. 631, 638, 44 N.W.2d 157 (1950). Further, the direct effect of the defense is to absolve of responsibility persons whose conduct is deemed criminal by the Legislature. The assignment of criminal responsibility is undeniably a matter of substantive law. For these reasons, the enactment of the entrapment defense as a general rule of procedure would be well beyond the scope of this Court's rulemaking authority under Const. 1963, art. 6, § 5. Because we lack the express authority to establish the entrapment defense as a general rule of practice and procedure under Const. 1963, art. 6, § 5, we also necessarily lack the implied authority to implement the entrapment defense as an exercise of our inherent authority to regulate procedure under Const. 1963, art. 6, § 1. It cannot be said that the existence of an entrapment defense is necessary for the courts to perform their essential judicial function.
Absent a valid rule establishing the entrapment defense, a court may not cite "entrapment" as a reason for refusing to apply the law to the facts of a given case. In such circumstances, the judicial decision to "bar the prosecution in order to preserve the institutional integrity," see Turner, supra at 21, 210 N.W.2d 336, quoting Russell, supra at 445, 93 S.Ct. 1637 (Stewart, J., dissenting), would impermissibly infringe both legislative and executive functions in violation of Const. 1963, art. 3, § 2. It is manifestly the function of the Legislature, and not the courts, to define illegal conduct. See Sorrells, supra at 449-450, 53 S.Ct. 210; Lamphere, 61 Mich. 105, 108, 27 N.W. 882 (1886). Further, it is properly the function of the executive, and not the courts, to determine whether to "proceed with the prosecution" under the law as defined by the Legislature. Sorrells, supra at 450, 53 S.Ct. 210; see also Genesee Prosecutor v. Genesee Circuit Judge, 386 Mich. 672, 683-684, 194 N.W.2d 693 (1972) (holding that trial court violated the separation of powers doctrine in amending an information over prosecutorial objection). Finally, the judicial branch lacks the authority to oversee the executive branch by wielding a "chancellor's foot" veto over disfavored law enforcement practices. Russell, supra at 435, 93 S.Ct. 1637. In sum, "[i]t is the responsibility of the court to determine the guilt or innocence of the offender. It is not the responsibility of the judiciary to supervise law enforcement procedure." Jamieson, supra at 79, n. 7, 461 N.W.2d 884 (BRICKLEY, J.).
In my view, the Solicitor General had the better argument in Sorrells: "[T]he Legislature, acting within its constitutional authority, is the arbiter of public policy." Id. at 445-446, 53 S.Ct. 210. "[W]here conduct is expressly forbidden and penalized by a valid statute, the courts are not at liberty to disregard the law and to bar a prosecution for its violation because they are of the opinion that the crime has been instigated by government officials." Id. at *357 446, 53 S.Ct. 210. Because Michigan's entrapment defense requires courts to "disregard the law" in precisely this manner, it should be abrogated.

V. STARE DECISIS
Although Michigan's entrapment jurisprudence is not clear, we have recognized an entrapment defense in some form since 1941. Thus, a decision to abrogate the entrapment defense cannot be made lightly. "Before this court overrules a decision deliberately made, it should be convinced not merely that the case was wrongly decided, but also that less injury will result from overruling than from following it." People v. Graves, 458 Mich. 476, 481, 581 N.W.2d 229 (1998), quoting McEvoy v. City of Sault Ste Marie, 136 Mich. 172, 178, 98 N.W. 1006 (1904). The principal injury that would result from overruling our entrapment cases would be that the public policy formerly advanced by the entrapment defense would no longer be enforced (unless, of course, the Legislature enacts a statutory entrapment defense). The principal injury that would result from adhering to our existing entrapment jurisprudence would be our continued unconstitutional usurpation of legislative and executive authority. To conclude that the former injury is greater than the latter would require us to conclude that the judicial branch may properly ignore its constitutional boundaries merely for the sake of the policy advanced. Because our duty to act within our constitutional authority is paramount, I would conclude that the greater injury would result from a continued usurpation of power we do not possess.
Because I would resolve this case on the merits, I respectfully dissent from the order vacating the grant of leave to appeal.
NOTES
[1] "From its inception, the entrapment defense was (and predominately remains) a uniquely American phenomenon." Lombardo, Causation and "objective" entrapment: Toward a culpability centered approach, 43 UCLA L. R. 209, 216 (1995). On the early development of the entrapment defense in the United States see Barlow, Entrapment and the common law: Is there a place for the American doctrine of entrapment?, 41 Mod. L. R. 266, 268-270 (1978); Lombardo, supra at 218-221; Marcus, The development of entrapment law, 33 Wayne L. R. 5, 9-13 (1986).
[2] The Supreme Court of New York County, New York, may have somewhat overstated public disdain for the concept of entrapment when, in 1864, it offered this oft-quoted appraisal of the defense:

Even if inducements to commit crime could be assumed to exist in this case, the allegation of the defendant would be but the repetition of the plea as ancient as the world, and first interposed in Paradise: "The serpent beguiled me and I did eat." That defence was overruled by the great Lawgiver, and whatever estimate we may form, or whatever judgment pass upon the character or conduct of the tempter, this plea has never since availed to shield crime or give indemnity to the culprit, and it is safe to say that under any code of civilized, not to say christian ethics, it never will. [Board of Comm'rs v. Backus, 29 How. Pr. 33, 42 (N.Y. Sup. Ct., 1864).]
Forty years later, the New York Court of Appeals reiterated the prevailing view:
We are asked to protect the defendant, not because he is innocent, but because a zealous public officer exceeded his powers and held out a bait. The courts do not look to see who held out the bait, but to see who took it. [People v. Mills, 178 N.Y. 274, 289, 70 N.E. 786 (1904).]
[3] Woo Wai was apparently only the second American case to overturn a criminal conviction on the basis of the entrapment defense. See Barlow, supra at 269.
[4] For general descriptions of the two prevailing theories see Russell, 411 U.S. 423, 429, 440, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); People v. Jamieson, 436 Mich. 61, 78, 461 N.W.2d 884 (1990) (BRICKLEY, J.); Dressler, Understanding Criminal Procedure, §§ 171-172, pp. 357-361. For more detailed commentary on the modern entrapment defense see Carlson, The act requirement and the foundations of the entrapment defense, 73 Va. L. R. 1011 (1987); Seidman, The Supreme Court, entrapment, and our criminal justice dilemma, 1981 Sup. Ct. R. 111 (1981).
[5] The Court explained that "[t]o construe statutes so as to avoid absurd or glaringly unjust results, foreign to the legislative purpose, is, as we have seen, a traditional and appropriate function of the courts." Id. at 450, 53 S.Ct. 210. In support of this proposition, the Court relied primarily on United States v. Palmer, 16 U.S. (3 Wheat) 610, 631, 4 L.Ed. 471 (1818), United States v. Kirby, 74 U.S. (7 Wall) 482, 486-487, 19 L.Ed. 278 (1868), Lau Ow Bew v. United States, 144 U.S. 47, 50, 12 S.Ct. 517, 36 L.Ed. 340 (1892), and United States v. Katz, 271 U.S. 354, 362, 46 S.Ct. 513, 70 L.Ed. 986 (1926). See Sorrells, supra at 446-448, 53 S.Ct. 210.
[6] The defendant did not ask the Court to reconsider Sorrells. See Sherman, supra at 376, 78 S.Ct. 819.
[7] In McNabb, supra at 340, 63 S.Ct. 608, the Court explained that "[j]udicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." Under this supervisory authority, the Court ruled that certain voluntary confessions obtained during an unlawful detention were inadmissible at trial.
[8] The Court explained that the basis for applying an exclusionary rule is the government's "failure to observe its own laws." Russell, supra at 430, 93 S.Ct. 1637, quoting Mapp v. Ohio, 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). There is, of course, no federal or state rule against entrapment.
[9] Three years later, Justice Rehnquist, writing for the plurality in Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), sought to distance himself from this statement in Russell by opining that the nonconstitutional defense of entrapment was the only remedy available to a criminal defendant claiming improper inducement. See Hampton, supra at 490, 96 S.Ct. 1646. Justices Powell, joined by Justice Blackmun, concurred in the result, but wrote separately because he was "unwilling to join the plurality in concluding that, no matter what the circumstances, neither due process principles nor our supervisory power could support a bar to conviction in any case where the Government is able to prove predisposition." Id. at 495, 96 S.Ct. 1646. The dissent did not reach the due process question. Id. at 500, n. 4, 96 S.Ct. 1646.
[10] A "chancellor's foot" is a "symbol of the variability of equitable justice." The phrase is attributed to seventeenth-century jurist John Selden. See Black's Law Dictionary (7th ed.), p. 225; see also Lonchar v. Thomas, 517 U.S. 314, 323, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996) ("As Selden pointed out so many years ago, the alternative [to rules and precedents] is to use each equity chancellor's conscience as a measure of equity, which alternative would be as arbitrary and uncertain as measuring distance by the length of each chancellor's foot. See 1 J. Story, Commentaries on Equity Jurisprudence 16 [13th ed. 1886].").
[11] The defendant sought to inquire about instances when the officer had "put in some false swearing" for the defendant or the parties. Id. at 220.
[12] This Court again criticized the practice of entrapment People v. Pinkerton, 79 Mich. 110, 115, 44 N.W. 180 (1889), where we opined, in dicta, that the police behaved scandalously in sending a man into an alleged "house of ill fame" to entrap the keeper of the house.

Similarly, in People v. McCord, 76 Mich. 200, 206, 42 N.W. 1106 (1889), we criticized a property owner for using a private agent to lure the defendant into breaking and entering certain property:
[I]t would be a disgrace to the law if a person who has taken active measures to persuade another to enter his premises, and take his property, can treat the taking as a crime, or qualify any of the acts done by invitation as criminal. What is authorized to be done is no wrong in law to the instigator.
The McCord case cannot be properly characterized as an entrapment decision, because it involved private authorization rather than government inducement. By definition, entrapment requires government inducement. Despite this important distinction, opinions addressing the subject of entrapment have occasionally examined McCord for guidance. See People v. Turner, 390 Mich. 7, 29-30, 210 N.W.2d 336 (1973) (BRENNAN, J., dissenting); People v. Sinclair, 387 Mich. 91, 120, n. 37, 194 N.W.2d 878 (1972) (SWAINSON, J.); People v. Smith, 296 Mich. 176, 182, 295 N.W. 605 (1941); Woo Wai, supra at 416.
[13] Given the Court's statement of the defendant's argument, it is not clear whether the defendant was raising a classic entrapment argument or merely arguing that the police involvement negated an element of the offense.
[14] The defendant's precise argument was not described in the opinion.
[15] In a short concurrence, Justice LEVIN supported continued adherence to the objective theory. Id. at 97, 461 N.W.2d 884. In dissent, Justice ARCHER agreed with the Court's adherence to the objective test, but disagreed with its application to the facts. Id. at 104, 461 N.W.2d 884.
[16] In a separate opinion, Justice GRIFFIN also restated his view that the entrapment defense should be eliminated. See Id. at 109-110, 475 N.W.2d 786.
[17] Although Justice BOYLE would have preferred to adopt a subjective test, she aligned herself with Justice BRICKLEY because the subjective test lacked sufficient support.
[18] Justice BOYLE concluded that a subjective entrapment test was preferable because the proper focus of entrapment should be on whether the police conduct actually instigated the crime. She reasoned that a reprehensible conduct test would, inter alia, prevent government authority from being undermined by reprehensible conduct. See id. at 93-95, 475 N.W.2d 786. "The inquiry is whether the government's conduct falls below an acceptable standard for the fair and honorable administration of justice." Id. at 97-98, 475 N.W.2d 786.
[19] Const. 1963, art. 3, § 2 provides:

The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.
[20] Although this Court may change the common law through its decisions, see Placek v. Sterling Heights, 405 Mich. 638, 656-657, 275 N.W.2d 511 (1979), we long ago recognized that the development of the substantive criminal law was properly a matter for the Legislature: "Whatever elasticity there may be in civil matters, it is a safe and necessary rule that criminal law should not be tampered with except by legislation." In re Lamphere, 61 Mich. 105, 109, 27 N.W. 882 (1886).
[21] Const. 1963, art. 6, § 4 grants this Court "superintending" control over lower courts. The authority to supervise lower courts is not equivalent to the authority to supervise the entire "administration of criminal justice," in the broadest sense of that phrase. Cf. Sherman, supra at 381, 78 S.Ct. 819 (Frankfurter, J., concurring in the result).
[22] The term "unlawful" was used loosely, of course, because application of the entrapment defense has never required an actual police violation of "the law."
[23] While the external regulation of the police is a legislative function, the executive branch is responsible for formulating police policies and supervising police practices.