**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 9, 2002**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                   No. 118351

JESSIE B. JOHNSON,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

    This case involves the defense of entrapment. The circuit court found that defendant was entrapped by the police and dismissed two charges of possession with intent to deliver more than 225, but less than 650, grams of cocaine. MCL 333.7401(2)(a)(ii). The Court of Appeals affirmed in a split decision.[1] We conclude that the lower courts clearly erred in

---

[1]Unpublished opinion per curiam, issued December 19, 2000 (Docket No. 219499).

finding that defendant was entrapped under Michigan's current entrapment test. *People v Juillet*, 439 Mich 34, 56-57; 475 NW2d 786 (1991) (opinion by Brickley, J.); *People v Jamieson*, 436 Mich 61, 80; 461 NW2d 884 (1990) (opinion by Brickley, J.). Accordingly, we reverse the Court of Appeals decision, reverse the trial court's order granting defendant's motion to dismiss the charges, and remand to the trial court for further proceedings consistent with this opinion.

## I.  Facts and Proceedings

Defendant was a police officer in the city of Pontiac. He also owned a house in the city of Pontiac that he rented out as a residence.

Defendant became the subject of a criminal investigation after one of defendant's former tenants turned informant and reported to the Pontiac police department that defendant was instrumental in operating his rented house as a drug den. The informant indicated that he sold crack cocaine from defendant's house with defendant's full knowledge and consent. Further, according to the informant, defendant arranged, oversaw, and protected the drug-selling operation. In exchange, defendant received a substantial portion of the profits from the drug sales.

The Pontiac police called in the state police for assistance in their investigation of defendant. An undercover officer from the state police department, Lieutenant Sykes,

was introduced by the informant to defendant as a major drug dealer in Detroit and Mount Clemens who wished to expand his operations into Pontiac. Defendant agreed to meet with Sykes, but not pursuant to any police investigation he was conducting himself. Defendant was propositioned by Sykes to serve as protection and security from "rip-offs" and police raids for Sykes' drug operations, as well as to identify potential locations for drug dens in Pontiac. Defendant was to be compensated for his services. Defendant agreed to participate only after he determined that Sykes was not an undercover officer known to defendant's fellow Pontiac officers. Defendant made no attempt to arrest Sykes or report his illegal activities for further investigation.

At Sykes' request, defendant agreed to accompany Sykes to a mall on February 7, 1992, to assist him in purchasing drugs from a supplier. The supplier was in reality another undercover state police officer.

Defendant and Sykes arrived at the mall parking lot in different vehicles. After some preliminary discussions, Sykes drove over to the undercover officer to make the staged drug deal, while defendant walked. Armed with a gun in his pocket, defendant stood one and a half car lengths from the passenger side of the second undercover officer's vehicle. After the transaction began, Sykes directed defendant to come to the driver's side of the undercover officer's vehicle. Sykes then

3

handed defendant the package of drugs received from the supplier in the staged drug deal. Defendant took the package and returned to Sykes' vehicle and waited for Sykes. At that time, defendant expressed some confusion regarding the exact procedures he was to follow, stating that he needed to know what to do "from A to Z." Sykes testified, and audiotapes of the February 7, 1992, drug deal confirm, that Sykes wanted defendant to take the drugs back to his car, check them, ensure that the package was correct, and notify Sykes of any problems. Sykes stated that in order for defendant to fulfill his duty to protect against "rip-offs," defendant would be required to hold and examine the drugs purchased. Sykes explained that he could not watch the supplier and the package at the same time. After this conversation, while defendant and Sykes weighed the cocaine, defendant indicated that as a result of their discussion he had a better understanding of what Sykes wanted him to do. Defendant did not express his unwillingness to perform the duties explained by Sykes. Sykes then paid defendant $1,000 for his assistance.

Sometime after this first drug deal, Sykes asked defendant if he wished to participate in future drug deals and told him that it was okay if he no longer wanted to participate. Defendant indicated that he wanted to be included in future transactions. As a result, a second,

4

similarly staged drug deal occurred on March 4, 1992, immediately after which defendant was arrested.

Defendant was charged with two counts of possession with intent to deliver more than 225, but less than 650, grams of cocaine. Defendant initially entered a *Cobbs*[2] plea with a visiting judge for two consecutive sentences of five to thirty years, sentences that were substantially less than the mandatory statutory minimum of twenty years for each offense. However, these sentences were reversed as being unsupported by substantial and compelling reasons required to depart from the mandatory statutory minimum. 223 Mich App 170, 175; 566 NW2d 28 (1997).

When the case returned to the trial court, defendant withdrew his guilty pleas and moved to dismiss the charges on the basis of an entrapment theory. The trial court granted defendant's motion to dismiss, reasoning that Sykes had changed defendant's duty during the first transaction from one of protection to one of actual drug possession, thus entrapping defendant into the drug possessions.

As indicated, the Court of Appeals affirmed in a split decision. The majority wrote that "[b]ecause many of the factors indicative of entrapment existed in this case, we hold that defendant has met his burden of proving that the police

---

[2]*People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

5

conduct would have induced an otherwise law-abiding person in similar circumstances as defendant to commit the offenses charged." Slip op at 3. It also concluded that "Sykes' conduct in this case was so reprehensible as to constitute entrapment." *Id.*

The dissenting judge argued that defendant was not entrapped because "defendant willingly participated in the proposed criminal enterprise" and the police did nothing more than provide defendant with an opportunity to commit the crime. Slip op at 1. Further, the dissenter disagreed with the majority's alternative conclusion that Sykes's conduct was so reprehensible as to establish entrapment.

This Court initially held plaintiff's application in abeyance pending our consideration of *People v Maffett*, 464 Mich 878; 633 NW2d 339 (2001), in which we ultimately denied leave to appeal. We then granted leave to appeal in this case, directing the parties to include among the issues to be briefed whether this Court should adopt the federal subjective entrapment test, and invited amicus curiae briefing. 465 Mich 911 (2001).

## II. Standard of Review

A trial court's finding of entrapment is reviewed for clear error. *Jamieson, supra* at 80. Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made. *People v Kurylczyk*,

6

443 Mich 289, 303; 505 NW2d 528 (1993) (opinion by G<small>RIFFIN</small>, J.). A defendant has the burden of establishing by a preponderance of the evidence that he was entrapped. *People v D'Angelo*, 401 Mich 167, 182; 257 NW2d 655 (1977).

### III. Analysis

Under the current entrapment test in Michigan, a defendant is considered entrapped if either (1) the police engaged in impermissible conduct that would induce a law-abiding person to commit a crime in similar circumstances or (2) the police engaged in conduct so reprehensible that it cannot be tolerated. *Juillet, supra; People v Ealy*, 222 Mich App 508, 510; 564 NW2d 168 (1997). However, where law enforcement officials present nothing more than an opportunity to commit the crime, entrapment does not exist. *People v Butler*, 444 Mich 965, 966; 512 NW2d 583 (1994).

### A. Inducing Criminal Conduct

When examining whether governmental activity would impermissibly induce criminal conduct, several factors are considered: (1) whether there existed appeals to the defendant's sympathy as a friend, (2) whether the defendant had been known to commit the crime with which he was charged, (3) whether there were any long time lapses between the investigation and the arrest, (4) whether there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen,

7

(5) whether there were offers of excessive consideration or other enticement, (6) whether there was a guarantee that the acts alleged as crimes were not illegal, (7) whether, and to what extent, any government pressure existed, (8) whether there existed sexual favors, (9) whether there were any threats of arrest, (10) whether there existed any government procedures that tended to escalate the criminal culpability of the defendant, (11) whether there was police control over any informant, and (12) whether the investigation was targeted. *Juillet, supra* at 56-57.

In holding that defendant was entrapped, the Court of Appeals found that defendant had not previously committed the possession with intent to deliver offenses charged, the procedures employed by the government escalated defendant's conduct to the charged offense, and the offer of consideration was excessive. On the basis of these three factors, it held that "[b]ecause many of the factors indicative of entrapment existed," the defendant "met his burden of proving that the police conduct would have induced an otherwise law-abiding person in similar circumstances as defendant to commit the offenses charged." Slip op at 3. We respectfully disagree.

First, while the Court of Appeals noted that defendant had "merely owned" a crack house and that no evidence existed that defendant was a drug dealer or even a drug user, it ignored ample evidence presented that defendant had in fact

8

previously committed the offense of possession with intent to deliver. To be convicted of the charge of possession with intent to deliver, the defendant must have knowingly possessed a controlled substance, intended to deliver that substance to someone else, and the substance possessed must have actually been cocaine and defendant must have known it was cocaine. *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998). Actual physical possession is unnecessary for a conviction of possession with intent to deliver; constructive possession will suffice. *People v Konrad*, 449 Mich 263, 271; 536 NW2d 517 (1995). Constructive possession exists when the totality of the circumstances indicates a sufficient nexus between defendant and the contraband. *People v Wolfe*, 440 Mich 508, 521; 489 NW2d 748 (1992). Possession is attributed not only to those who physically possess the drugs, but also to those who control its disposition. *Konrad, supra* at 271-272. In addition, possession may be either joint or exclusive. *People v Hill*, 433 Mich 464, 470; 446 NW2d 140 (1989).

Defendant owned a home that he rented to tenants who operated it as a drug house. Despite being a police officer in the jurisdiction in which the house was located, defendant knew and consented to the house being used for drug sales. Further, defendant provided protection for the operation and received a portion of the profits from the drug sales, specifically $200 for each quarter ounce of drugs sold from

the house.

The dissent suggests that in determining that defendant had engaged in drug activities, our opinion "strips the deference that is due credibility determinations made by lower courts . . . ." *Post* at 7. The dissent is mistaken. Our conclusion that defendant previously possessed cocaine is one that we make as a matter of law. What the dissent concedes, that "the record supports the Court of Appeals conclusion that defendant did nothing more than own a crack house and accept money to keep silent," *is* possession. *Post* at 4. Further, unlike the dissent, we do not limit our review of whether the lower courts clearly erred to the hearing testimony, but rather review the entire record. While the hearing testimony arguably lends itself to different conclusions, the audio tapes admitted into the record do not. While the dissent only cites an officer's hearing testimony regarding corroboration, the undercover audio recordings of defendant's conversation undisputedly establish that defendant played a role in the drug operation:

> [*Informant*]: So I can take the hundred and invest it or what?
>
> [*Defendant*]: Alright, man, I'm gonna give you one more shot.
>
> [*Informant*]: Okay, dig, the same arrangement, the two off every quarter?
>
> [*Defendant*]: Yeah.

As far as corroboration of defendant's past participation in drug activities, this first taped telephone conversation between the informant and defendant is clear evidence that defendant previously received $200 for every quarter ounce of cocaine sold by the informant at the house and that defendant wished and agreed to continue this arrangement.

Under these circumstances, it is clear these alleged previous actions by defendant could serve as the foundation for a conviction for possession with intent to deliver under a constructive possession theory. Defendant had a duty to arrest the informant, yet not only did he permit the informant to sell drugs, he accepted money to provide protection for the operation. Without such protection, drugs would not have been sold from the house. Accordingly, defendant controlled the disposition of drugs at the house he owned and shared in the profits in so doing. For these reasons, we find clear error in the lower court's deduction that there was insufficient evidence to surmise that defendant had not previously committed the offense of possession with intent to deliver cocaine. Further, we agree with the dissenting judge in the Court of Appeals that defendant's prior actions, at the very least, are sufficient to establish the charge of possession with intent to deliver cocaine as an aider and abettor. See *People v Sammons*, 191 Mich App 351, 371-372; 478 NW2d 901 (1991).

Second, contrary to the Court of Appeals majority, we are not convinced that the procedures employed by the police escalated defendant's criminal culpability. The Court of Appeals majority wrote:

> [T]he procedures employed by the police escalated defendant's conduct from merely owning a drug house to possession with intent to deliver cocaine. Sykes initially "hired" defendant to protect against arrest and theft and to inform Sykes of any potential drug raids. At the first staged drug buy, however, Sykes called defendant over and handed defendant the package of cocaine. It was only after the first transaction that defendant was informed that he was expected to handle the drugs, check them, and ensure that the package was "right." This active involvement was not contemplated prior to the buy. Sykes' actions, therefore, served to escalate defendant's passive involvement in the enterprise to active participation beyond the scope of what defendant had agreed to beforehand and pressured defendant into complying with Sykes' requests in order to remain a part of the enterprise. [Slip op at 3.]

It is somewhat unclear whether the majority's escalation analysis was based on its assessment of defendant's prior drug activity at his rental home or its conclusions about defendant's expected role in the undercover operation. However, regardless of what the majority held was escalated, it clearly erred.

As discussed above, defendant's previous actions concerning his drug house operation amounted to possession with intent to deliver. Both offenses charged as a result of the undercover operation were possession with intent to deliver. Therefore, no conduct by the state police in the

12

undercover operation could serve to escalate defendant's prior criminal activity. Rather, the government simply provided defendant with an additional opportunity to commit a crime that he had previously committed. Presenting nothing more than an opportunity to commit the crime does not equate with entrapment. *Butler, supra.* Because defendant's previous drug activity amounted to possession with intent to deliver, the undercover activity at issue in this case did nothing more than present defendant with an opportunity to commit that crime. Accordingly, no escalation occurred.

Similarly, defendant's culpability was not escalated at the scene of the first transaction in regard to the role defendant agreed to play in the undercover drug transaction. The touchstone of the Court of Appeals opinion in this regard was that placing the drugs in the hands of defendant at the scene of the first drug deal was a violation of what defendant had agreed to do. However, our review of the record leads us to conclude that touching the drugs should not have come as a surprise to defendant.[3]

---

[3]We note that the dissent's rationale for concluding that the lower courts correctly concluded that defendant could not have expected to handle the drugs at the transactions is based, again, on its limited review of the record. While the hearing transcript does indeed reflect that all parties agreed there was no evidence that defendant was informed that he would have to handle drugs *on the February 7th audio tape*, no such agreement was made regarding all the audio tapes introduced at the hearing. A full review of the taped recordings, as we provide below, supplies ample evidence that

Although the taped recording of the first drug transaction suggests that defendant was unsure precisely what he was to do beyond providing "protection," that confusion was not based on defendant's lack of agreement to do more. We disagree with the dissent's argument that the defendant's confusion about his role *on the day of the first transaction* was an absolute indication of defendant's agreed-upon role in the entire enterprise. Rather, the record clearly shows that defendant indicated many days before the first transaction that he was willing to handle the drugs. Indeed, defendant was hired by Sykes to protect and secure against arrests, police raids, and "rip-offs." While the Court of Appeals construed "rip-off" as narrowly as possible by equating it with "theft," protecting against a "rip-off" would seem to include ensuring that drug packages received at drug deals contain actual drugs in the negotiated quantity and quality, a task that necessarily requires taking possession of the drugs in order to properly inspect them. A recorded audiotape of defendant and Sykes discussing their arrangement before the first staged drug transaction demonstrates that Sykes informed defendant that he would have to handle the drugs on occasion:

---

defendant fully understood that his role included handling the drugs. Contrary to the dissent's allegation, this is not a mischaracterization of the record or a failure to give deference to the trial court's credibility determinations. Rather, our conclusion is based on the actual audio recordings of the investigation that were admitted into the record.

14

> *Sykes*:  . . . And probably on occasion, I'm gonna need your expertise to accompany me to pick up a package or two, okay. . . . So if, you know, just run here, run there, pick up some, and we'll be straight, okay.  That's, that's basically all that you got to do, I'll run the rest.

> *Defendant*:  Okay.[4]

In addition, defendant's willingness to participate in the crimes charged is evidenced by his agreement to participate in further transactions *after* he participated in the first transaction, which included his taking possession of the drugs.  We further note that the second drug transaction between defendant and the undercover police officers exposes a consideration that the lower courts appear to have overlooked during their review.  Initial entrapment does not immunize a defendant from criminal liability for subsequent transactions that he readily and willingly undertook.  See *People v Crawford*, 143 Mich App 348, 353; 372 NW2d 550 (1985); *People v Larcinese*, 108 Mich App 511, 515; 310 NW2d 49 (1981).  Accordingly, even if the Court of Appeals had been correct in concluding that defendant was entrapped during the first transaction, his willingness to participate in the second transaction, after his duties were more emphatically explained, would prohibit dismissal of the second charge.

For these reasons, it is apparent that Sykes' handing the

---

[4]At the very least, this exchange between Sykes and defendant clearly establishes defendant's approval to constructively possess drugs.

15

drugs to defendant for inspection during the first transaction failed to escalate defendant's criminal culpability. As a result, the Court of Appeals clearly erred in concluding otherwise.

Finally, the Court of Appeals majority clearly erred in holding that the amount of money offered for defendant's services was excessive and unusually attractive. The majority held that defendant knew that he stood to earn up to $50,000 by participating in the enterprise. The prosecutor suggests that the record reflects that Sykes stated that *Sykes* stood to earn about $50,000. Our review of the record leads us to conclude that the record does not firmly establish either interpretation. However, we conclude that, given defendant's understanding that he would receive $1000 for each transaction, the compensation was neither excessive or unusually attractive. Each transaction involved approximately ten ounces of cocaine, which had an estimated street value of $75,000. A $1,000 fee for a transaction involving almost $75,000, roughly one percent of the street value, is not excessive. This is especially evident given that defendant previously earned a $200 profit, or nearly thirty percent of the street value, for the sale of one quarter ounce of cocaine at his crack house, which the record reflects had a street value of approximately $700. Thus, the Court of Appeals clearly erred in ascertaining that defendant was impermissibly

16

induced because the consideration for his illegal services was excessive or unusually attractive.

In sum, we have concluded that the Court of Appeals clearly erred in regard to each of the three factors that persuaded that Court to conclude that the police engaged in conduct that would induce a law-abiding person to commit a crime in similar circumstances. Therefore, because none of the remaining *Juillet* factors are at issue, we hold that defendant failed to establish by a preponderance of the evidence that the police engaged in conduct that would induce a law-abiding person to commit a crime in similar circumstances.

## B. Reprehensible Conduct

The Court of Appeals alternatively held that the police conduct was so reprehensible that, as a matter of public policy, it could not be tolerated regardless of its relationship to the crime and therefore constituted entrapment. The majority based its reasoning primarily on its escalation analysis, finding that "Sykes waited until the scene of the staged drug buy to inform defendant that he was expected to handle the drugs and gave defendant no choice but to accept the package that was placed in defendant's hands . . . ." Slip op at 3. We disagree.

As we discussed above, defendant was hired to protect against arrests, raids, and "rip-offs." In light of his

alleged familiarity with drug operations, defendant should have expected that ensuring against "rip-offs" would include, among other things, examining the drugs for their legitimacy and holding the drugs to prevent a theft at the scene of the drug deal. More importantly, as indicated above, the negotiations between defendant and Sykes before the first transaction support this understanding.[5] Given our conclusion that defendant had previously committed the offense of possession with intent to deliver and that he agreed to provide protection against "rip-offs," which clearly includes handling the drugs in order to inspect them, the police did nothing more than provide defendant with an opportunity to commit a crime. Such conduct was not reprehensible and does not establish entrapment. *Butler, supra.*

For these reasons, we conclude that the Court of Appeals clearly erred in finding that defendant established by a preponderance of the evidence that the police conduct in this case was so reprehensible as to constitute entrapment.

C. The Entrapment Test in Michigan

We originally granted leave to appeal in this case to

_____

[5]Further, as the dissenting Court of Appeals judge points out, defendant himself was a police officer and had a duty to arrest Sykes. Instead, defendant willingly participated in the criminal enterprise and even met with Sykes at the Pontiac police department station before these drug deals in order to determine whether Sykes was an undercover officer who would be recognized by defendant's fellow officers.

18

consider whether the current entrapment test in Michigan, a modified objective test, is the most appropriate one. Accordingly, we asked the parties to address whether this Court should adopt the federal subjective test for entrapment. *Sorrells v United States*, 287 US 435; 53 S Ct 210; 77 L Ed 413 (1932). However, because defendant's case fails to meet even the current more lenient modified objective test,[6] we do not need to reach that question.

Nevertheless, after review of our entrapment defense law, we note that Chief Justice CORRIGAN has raised serious questions regarding the constitutionality of *any* judicially created entrapment test in Michigan. *Maffett*, *supra* at 878-899 (CORRIGAN, C.J., dissenting). Accordingly, we urge the Legislature to consider these questions and determine whether a legislative response is warranted.

## IV. Conclusion

The Court of Appeals clearly erred in finding that the defendant was entrapped by the government under Michigan's current entrapment test. The police did not engage in conduct that would induce a law-abiding person to commit a crime in similar circumstances; nor was the police conduct in this case

---

[6]The objective test is generally considered to be more favorable to defendants than the subjective test. *See* Tawil, *"Ready? Induce. Sting!": Arguing for the government's burden of proving readiness in entrapment cases*, 98 Mich L R 2371, 2378 (2000).

so reprehensible as to constitute entrapment. Indeed, the record suggests that defendant had already committed the crime for which he was charged. Accordingly, we reverse the Court of Appeals decision, reverse the trial court's order granting defendant's motion to dismiss the charges, and remand to the trial court for further proceedings consistent with this opinion.

CORRIGAN, C.J., and TAYLOR and MARKMAN, JJ., concurred with YOUNG, J.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                      No. 118351

JESSIE B. JOHNSON,

    Defendant-Appellee.

_____

WEAVER, J. (*concurring*).

    I concur in all but part III(C) of the opinion.  I do not join with the Court in hinting that the judicially created entrapment defense may be unconstitutional, and then referring that unanswered question to the Legislature.

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                                                No. 118351

JESSIE B. JOHNSON,

    Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

I concur in the majority's holding that the police conduct did not entrap defendant into the second transaction. However, I would conclude that the police conduct did entrap defendant into the first transaction; therefore, I respectfully dissent.

The majority's conclusion that defendant constructively possessed cocaine and, therefore, was not entrapped into committing the possession crimes is based on repeated references to the informant's claim that defendant "arranged, oversaw, and protected" the drug sales at the home defendant owned. See slip op at 2, 9 ("[d]efendant owned a home that he

rented to tenants who operated it as a drug house" and protected and received money for drugs sold.) Upon review of the entrapment hearing testimony, I question how the majority relies on this as support for its conclusion. The informant did not testify at the entrapment hearing. Rather, the information that the informant allegedly relayed to the police came into evidence through the police officer the informant contacted about defendant. This officer testified as follows:

> Q. Now did this [informant] tell you how he [defendant] was involved?
>
> A. Yes he did.
>
> Q. And would you tell us what it was?
>
> A. He said he was running a dope house.
>
> Q. When you say he, you mean [defendant]?
>
> A. No. [The informant] was running a house that–[defendant] owned the house and [the informant] was selling crack out of the house with [defendant's] full knowledge and consent and more or less participation; not in the actual sale, but in setting it up and providing protection and in running the operation.

The majority's focus on this portion of the police officer's testimony to support its repeated assertion that there was sufficient evidence showing defendant was more involved than the Court of Appeals discussed is misplaced. The most crucial part of the officer's testimony, which sheds light on the Court of Appeals reasoning, is omitted.

> Q. Did you ever run across any independent

corroboration of [the informant's] word?

*A.* I'm sorry?

*Q.* Independent corroboration meaning was there any evidence other than [the informant's] statements that [defendant] had been involved in the-this proported [sic] dope house?

*A.* At that point, no.

*Q.* At any point?

*A.* Yes.

*Q.* And what was that?

*A.* I checked records on the house that was pointed out and [defendant] did in fact own that house; to me that was corroboration.

*Q.* Well . . .

*A.* It was-I knew it personally to be a dope house. However, prior to that point I did not know that [defendant] owned it.

*Q.* Okay. I guess what I'm asking is [the informant's] story was that [defendant] was-knew about it and was looking the other way and taking money, isn't that it?

*A.* That's correct.

The police officer initially stated that the informant told him defendant set up, ran, and supervised the drug house. However, when asked what information corroborated what the informant allegedly said, the officer pointed to *only the fact that defendant owned the home and accepted money to look the other way*. The trial court made its credibility determination on this testimony that defendant had no other involvement

beyond owning the drug house and bribery.  Contrary to the picture the majority paints of defendant's part in the drug sales occurring in the home he owned, the record supports the Court of Appeals conclusion that defendant did nothing more than own a crack house and accept money to keep silent.  Thus, the majority's mischaracterization of defendant's involvement directly conflicts with this Court's duty to give deference to credibility determinations in light of direct testimony

**supporting them.**[1]

---

[1]The majority faults me for limiting my review to the hearing testimony from the entrapment hearing instead of the entire record, which, according to the majority, "supplies ample evidence" that defendant knew that his role was to "handle" the drugs. *Ante* at 14, n 3. Contrary to the majority's assertion, I did not limit my review, but extracted evidence from the entire record that I believe supports the conclusion that defendant was entrapped into possessing the drugs in the first transaction (the *only* transaction for which I would conclude defendant was entrapped). To satisfy the majority's concern, however, the following is an excerpt from the body recordings of the undercover officer and defendant, which again proves that the majority's heavy reliance upon ambiguous dialog between defendant and the undercover officer before the February 7 audio tape is suspect. See *ante* at 15. Even after the ambiguous discussion, which the majority quoted, defendant clearly stated that he thought his involvement was to protect.

> [*Undercover Officer*]: Ah man, alright, alright look, the reason, the reason I got you there is so that you there not eight places away. If you eight places away, you ain't doing me no good.
>
> [*Defendant*]: Two cars away.
>
> [*Undercover Officer*]: That ain't doing me no good.
>
> [*Defendant*]: I heard everything you said.
>
> [*Undercover Officer*]: What?
>
> [*Defendant*]: I could hear you talking.
>
> [*Undercover Officer*]: No, no, I don't want you to hear me talk. I want you, I, you got to be there, that's why I said ride up in the car with me. That way I can, if something happens man, I'm still stuck with the Goddamn package. I want to pitch it . . . . That's, that's what I want.
>
> [*Defendant*]: Oh, you want me to handle it.
>
> [*Undercover Officer*]: I don't want, no, no, no, no, I, but if you're in the car, just roll down

**(continued...)**

5

Moreover, the majority uses its own credibility judgment to supersede that of the lower courts to conclude that defendant knew about his duty to handle the drugs before the first transaction. The majority states, "A recorded audiotape of defendant and [the undercover officer] discussing their arrangement before the first staged drug transaction demonstrates that [the undercover officer] informed defendant that he would have to handle drugs on occasion . . . ." Slip op at 14. When faced with the same evidence, the lower court and the attorneys themselves disagreed with the police witness and came to the contrary conclusion:

> *A.* [*Undercover Officer*]: I believe I told [defendant] that we would—we met with the individual in which I was to make the purchase from, he was to take the drugs, check them, ensure that the package was right, let me know that it was right, and then we would leave.

_____

¹(...continued)
the window. I can pitch it in there. I ain't got, I ain't holding nothing. That's what I'm talking about, see? But you standing way over there, now I got to hold it and hold it, and hold it, until you get there because I, I, I can't check the package and check him too. Alright. That's my boy, but business is business.

[*Defendant*]*: I thought you wanted protection, that's what I was under the impression that you wanted me for.* [Emphasis added.]

This conversation took place *after* the first transaction, thus revealing that defendant did not know he was to "handle" the drugs, but only thought he was to protect the undercover officer before the first transaction.

6

> *Q.* [*Defense Counsel*]: Now, Lieutenant, I
> don't see that in the transcript of the audio tapes
> that was made.  Let me hand this to you and maybe
> you can show me.
>
> *Mr. Martin* [*Assistant Prosecutor*]: Which
> transaction are we talking about?
>
> *Mr. Szokolay* [*Defense Counsel*]: The transcript
> of the recording, body recording made February 7,
> 1992 [the first transaction].
>
>        * * *
>
> *The Court*: Are you looking for something?
>
> *Mr. Szokolay*: Yes, your Honor.  The witness
> told us that he had told [defendant] prior to the
> buy that he would be expected to hold the package,
> and I asked him to find us where he said that.
>
> *The Court*: Mr. Martin, can you agree that
> maybe it's not there?
>
> *Mr. Martin*: Your Honor, *I believe the
> recording on February 7th doesn't indicate prior to
> the deal that he was informed of that, but on page
> five it indicates that he was informed of that
> after, that it would be his job to check the
> package.*
>
> *The Court*: That would be from the next
> transaction.

The Court of Appeals did not clearly err in concluding that on the basis of this evidence, the defendant was not informed before the first transaction that he would have to hold the drugs.  Rather, all parties agreed that there was *no* evidence on that audio tape suggesting defendant was informed he would have to handle the drugs prior to the first transaction.

7

I cannot join a decision that not only mischaracterizes the facts in favor of a result, but also strips the deference that is due credibility determinations made by lower courts in such a way as the majority does today. Accordingly, I would reverse in part the decision of the Court of Appeals holding defendant was entrapped into the second possession transaction and affirm in part the decision of the Court of Appeals holding defendant was entrapped into the first.

KELLY, J., concurred with CAVANAGH, J.