# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellant,

UNPUBLISHED
December 15, 2015

v

No. 319991
Oakland Circuit Court
LC No. 2013-245268-FH

EARL CANTRELL CARRUTHERS,

   Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellant,

v

No. 319992
Oakland Circuit Court
LC No. 2013-245250-FH

RYAN TINSLEY CARRUTHERS,

   Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellant,

v

No. 319993
Oakland Circuit Court
LC No. 2013-245247-FH

DERRICK SHOMARI HOLOMAN,

   Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellant,

v

No. 319994
Oakland Circuit Court
LC No. 2013-245261-FH

VERTRECE LEO SHEPARD WELLS,

Defendant-Appellee.

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v                                      No.  319995
                                          Oakland Circuit Court

DEONTE PIERRE ARNOLD,                  LC No.  2013-245248-FH

        Defendant-Appellee.

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v                                        No.  319996
                                        Oakland Circuit Court

SHERALYN MEDIANTE GEER,               LC No.  2013-245249-FH

        Defendant-Appellee.

Before:  SAAD, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

In these consolidated cases, the prosecutor appeals the circuit court's dismissal of the charges against defendants on the basis of entrapment. For the reasons stated below, we reverse and remand.

<h2 style="text-align:center">I.  NATURE OF THE CASE</h2>

In this medical marijuana action, the trial court's erroneous ruling, which dismissed this case against defendants on the grounds of "entrapment," conflicts with the black letter law of entrapment and the Michigan Medical Marihuana Act ("MMMA"),[1] MCL 333.26421 *et seq.*

---

[1] The MMMA uses an outdated spelling, "marihuana." Throughout the opinion, we use the current and common spelling "marijuana" unless quoting from the MMMA or cases that use the older spelling. See *People v Hartwick*, 498 Mich 192, 198 n 2; 870 NW2d 37 (2015).

The MMMA is an "exception to the Public Health Code's prohibition on the use of controlled substances,"[2] and its protections are accordingly "limited to individuals suffering from serious or debilitating medical conditions or symptoms, to the extent that the individuals' marijuana use is carried out in accordance with the provisions of [the MMMA]."[3]  To further the underlying medical purposes of the law, the MMMA has *always* required that a provider of marijuana sell or transfer marijuana only to those patients with whom the provider is connected through the Department of Community Health's ("DCH")[4] registration process.  MCL 333.26424(b).[5]

In keeping with the purpose of the MMMA, our courts have held that individuals who operate marijuana dispensaries—emporiums where *any* patient can purchase marijuana from *any* provider, regardless of whether the patient and the provider were connected through DCH's registration process—*do not* comply with the MMMA and may not receive its legal protections.[6]  Due to these infirmities, the business model of a marijuana dispensary violates the MMMA, and, importantly for our analysis, our courts have also held that undercover police operations to expose this ongoing illegality do not "entrap" the individuals operating the marijuana dispensary.[7]

Here, defendants ran or worked for a marijuana dispensary called Green Greener Grow ("G3"), and held themselves out to sell (and actually sold) marijuana to patients with whom they were not connected through DCH's registration process.  Therefore, by definition, they were engaged in an ongoing criminal enterprise that did not comply with the MMMA.  Because defendants were neither induced nor seduced into this "business" by the police, but rather were exposed and caught in their ongoing illicit activity—via a classic, textbook undercover sting operation—they were not entrapped.  For each of these reasons, which we explain in detail below, the trial court's dismissal of the charges is hereby reversed, and we remand for reinstatement of the charges against defendants.

---

[2] *People v Bylsma*, 493 Mich 17, 27; 825 NW2d 543 (2012).

[3] *People v Kolanek*, 491 Mich 382, 394; 817 NW2d 528 (2012) (quotation marks omitted).

[4] After the events relevant to this case, the Michigan Department of Community Health merged with the Department of Human Services to create the Department of Health and Human Services.  For ease of reference, we refer to the Department by its former name, "the Department of Community Health," throughout the opinion.

[5] See also *Michigan v McQueen*, 493 Mich 135, 156; 828 NW2d 644 (2013); *Michigan v McQueen*, 293 Mich App 644, 670; 811 NW2d 513 (2011), aff'd on other grounds 493 Mich 135.  Our Court has also held that both of these decisions apply retroactively. *People v Johnson*, 302 Mich App 450, 466; 838 NW2d 889 (2013).

[6] See *McQueen*, 493 Mich at 142-143; *People v Vansickle*, 303 Mich App 111, 113-114; 842 NW2d 289 (2013).

[7] *Vansickle*, 303 Mich App at 117.

## II. FACTS AND PROCEDURAL HISTORY

Defendants operated and worked for G3, a marijuana dispensary in Southfield. G3 was a sophisticated entity that stocked and sold a wide variety of marijuana products to individuals it had selected as "members" of the dispensary. Prospective members were required to provide documentation that they were authorized to use marijuana for medical purposes under the MMMA. Defendants Earl and Ryan Carruthers also ran a separate entity, Graceful Financial Solutions, to manage G3's payments and revenue.

In 2011, the Oakland County Sherriff began to investigate G3 to ensure the business complied with the MMMA. The sheriff's deputy assigned to visit G3 used an undercover persona, and assembled the following documents to use in his interactions with the staff: (1) a driver's license; (2) an application for a medical marijuana registry identification card, and a copy of a cashed money order payable to "State of MI – MMMP" to show that the state had accepted his application; and (3) a photocopied certification from a doctor recommending the use of marijuana for medical purposes.[8]

On December 5, 2011, the deputy took these documents to G3, and presented them to defendant Sheralyn Geer. Thereafter, he filled out a membership form to become a member of G3—which would allow him to purchase marijuana from the organization—and was accepted as a member.

After the deputy completed the relevant membership paperwork, defendant Geer took him to meet defendant Derrick Holoman in another room, which contained jars of marijuana and marijuana edibles. Holoman provided the deputy with a price list for the various types of marijuana on sale, and sold the deputy a wide assortment of marijuana products. Before leaving the G3 office, defendant Geer gave the deputy a G3 membership card, and told him that he only needed to provide the membership card to purchase marijuana from G3 in the future.

Throughout December 2011 and January 2012, defendants sold the deputy marijuana and other marijuana products. As Geer accurately informed him, after the deputy became a G3 member, he could purchase marijuana on request from defendants without establishing that he had a valid medical reason for using the drug. Specifically, the deputy purchased marijuana from defendants at G3 on two occasions by simply showing his membership card or giving his membership number.[9] He also placed two mail orders for marijuana, and defendants shipped him marijuana on each occasion. G3 attempted to conceal the fact that it filled the deputy's

---

[8] The driver's license and registry card used by the sheriff's deputy were issued in the name of his fictitious undercover persona. However, the doctor's certification was not actually issued in the name of the undercover persona—the deputy photocopied a MMMA Physician Certification completed by a doctor on behalf of another patient, and inserted the name of his undercover persona in place of the original patient.

[9] Defendant Holoman conducted one sale; defendant Wells conducted the other.

orders by using a false name and address on the packages that contained the marijuana, but the marijuana was packed in shredded G3 membership cards.

Thereafter, the police conducted a raid on G3's premises, and found the following: 31 jars of marijuana weighing a combined total of 8,456 grams, marijuana cigarettes, liquid marijuana, marijuana rice crispy treats, marijuana brownies, 2 containers of marijuana weighing a combined total of 55 grams. G3's offices also contained packaging materials, scales, heat sealers, marijuana grinders, FedEx receipts, and various other marijuana paraphernalia.

The prosecution charged defendants with conspiracy to deliver marijuana, in violation of MCL 750.157a and MCL 333.7401(2)(d)(*iii*). Some of the defendants faced additional charges: (1) Earl Carruthers and Ryan Carruthers were each charged with third-degree money laundering, MCL 750.411m, and possession with intent to deliver marijuana, MCL 333.7401(2)(d)(*iii*); (2) Holoman was charged with two counts of delivery of marijuana, MCL 333.7401(2)(d)(*iii*), and one count of possession with intent to deliver marijuana; (3) Wells was charged with one count each of delivery of marijuana and possession with intent to deliver marijuana; (4) Deonte Arnold was charged with possession with intent to deliver marijuana, and (5) Geer was charged with delivery of marijuana. Although the defendants filed many separate motions, all of the defendants, except for Ryan Carruthers, filed a motion to dismiss all charges based on the theory that the sheriff's deputy "entrapped" them when he purchased marijuana from them.

After a hearing on the matter, the trial court, in a written opinion and order, held that the sheriff's deputy entrapped defendants because he used "forged" documents to obtain the marijuana, and, but for his conduct, the defendants could have raised an affirmative defense under § 8 of the MMMA, MCL 333.26428. In its appeal, the prosecution says, and we agree, that the deputy's actions cannot constitute entrapment because defendants were already engaged in illegal activity when the deputy purchased the marijuana. Defendants ask us to affirm the ruling of the trial court.

## III. STANDARD OF REVIEW

This Court "review[s] de novo as a matter of law whether the police entrapped a defendant, but the trial court's specific findings of fact are reviewed for clear error." *People v Vansickle*, 303 Mich App 111, 114; 842 NW2d 289 (2013). The trial court's findings of fact are clearly erroneous if this Court is "left with a firm conviction that the trial court made a mistake." *Id.* at 115.

## IV. ANALYSIS

### A. LEGAL STANDARDS

"Entrapment is a criminal defense, and the defendant bears the burden of establishing entrapment by a preponderance of the evidence. The purpose of this defense is to deter abuse of authority by precluding criminal liability for acts that were instigated by the police and committed by those not predisposed to such acts." *People v Akhmedov*, 297 Mich App 745, 752; 825 NW2d 688 (2012) (citations omitted). In other words, the entrapment defense exists to prevent the police from engaging in "the manufacturing of crime." *People v Williams*, 196 Mich App 656, 665; 493 NW2d 507 (1992).

Accordingly, under these facts, to show entrapment, defendants must demonstrate that "the police engaged in impermissible conduct that would *induce a law-abiding person* to commit a crime in similar circumstances." *People v Johnson*, 466 Mich 491, 498; 647 NW2d 480 (2002) (emphasis added). To determine whether the police have induced "a law-abiding person to commit a crime," the court considers a variety of factors, including

> (1) whether there existed appeals to the defendant's sympathy as a friend, (2) whether the defendant had been known to commit the crime with which he was charged, (3) whether there were any long time lapses between the investigation and arrest, (4) whether there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen, (5) whether there were offers of excessive consideration or other enticement, (6) whether there was a guarantee that the acts alleged as crimes were not illegal, (7) whether, and to what extent, any government pressure existed, (8) whether there existed sexual favors, (9) whether there were any threats of arrest, (10) whether there existed any government procedures that tended to escalate the criminal culpability of the defendant, (11) whether there was police control over any informant, and (12) whether the investigation was targeted. [*Id.* at 498-499.]

When it determines whether the police entrapped a defendant, a court must consider each transaction between the defendant and the police on a separate basis. *Akhmedov*, 297 Mich App at 754. This is because an initial incident of entrapment "does not immunize a defendant from criminal liability for subsequent transactions that he readily and willingly undertook." *Johnson*, 466 Mich at 505. It is also not appropriate for the court "to judge if the scheme or plan employed was the best or most effective way to detect criminal behavior. . . . The question of entrapment centers on whether the police conduct served to manufacture rather than investigate the crime in question . . . ." *People v Jamieson*, 436 Mich 61, 82; 461 NW2d 884, 892 (1990).

Needless to say, a defendant is *not* entrapped when the police "present nothing more than an opportunity to commit the crime." *Johnson*, 466 Mich at 498. Nor does an undercover officer's use of deceit in his dealings with criminals constitute entrapment, and this "deceit" cannot "bar prosecution" for the crimes he witnesses the criminals committing. *Williams*, 196 Mich App at 663. This is because undercover police work, by definition, involves the use of deceit to ferret out illegal activity that would not be discovered if police operated openly. *People v Sesson*, 45 Mich App 288, 295-296; 206 NW2d 495 (1973); see also *Jamieson*, 436 Mich at 82-83.

## B. APPLICATION

Clearly, this case does not involve entrapment. In fact, "the government simply provided defendant[s] with an additional opportunity to commit a crime that [they] had previously committed." *Johnson*, 466 Mich at 503. This investigation and prosecution is a textbook example of basic undercover police work to expose and prosecute ongoing illegality perpetrated by defendants that, by definition, cannot cause entrapment. The trial court made a number of legal errors when it held that the police entrapped these defendants. In so doing, the trial court ignored basic textbook, black letter law. And, such a ruling, if allowed to stand, would seriously undermine law enforcement's ability to uncover crime.

Again, to determine whether an act by police constituted entrapment, the court must look to the circumstances of that specific act alone. *Akhmedov*, 297 Mich App at 754. Stated another way, the court must analyze each instance of possible entrapment separately because an initial incident of entrapment "does not immunize a defendant from criminal liability for subsequent transactions that he readily and willingly undertook." *Johnson*, 466 Mich at 505.

Here, the trial court made no effort to analyze each interaction between the deputy and defendants, and instead made a *general* holding that the deputy's behavior "entrapped" defendants.[10] Had the trial court examined each transaction between the deputy and defendants, it would have discovered that two defendants—Earl and Ryan Carruthers—never personally interacted with the deputy. Accordingly, it is impossible, as a matter of logic and law, for the deputy to have entrapped them. Nonetheless, the trial court erroneously held that the deputy entrapped *all six defendants*—despite the fact that: (1) he had never interacted with two of the defendants, and (2) one of the defendants, Ryan Carruthers, did not even raise entrapment as a defense.

The court made no effort to analyze whether the police induced defendants' criminal conduct. This is probably because it is readily apparent that defendants were *already engaged* in criminal conduct *before* any of their interactions with the deputy. In and of itself, G3's business model—a member's only marijuana emporium that allowed *anyone* to become a member, regardless of whether they were paired with G3 through the Department of Community Health's registration system—violated the MMMA.[11]

Despite defendants' and the trial court's unsupported insinuations to the contrary, the MMMA has *never* permitted *any* registered caregiver or patient to sell marijuana to *any* other patient.[12] See MCL 333.26424(b); *Michigan v McQueen*, 493 Mich 135, 156; 828 NW2d 644

---

[10] To repeat, the deputy purchased marijuana from defendants on five separate occasions: three at G3's physical office, from defendants Holoman and Wells, and two by mail.

[11] This is not to say that the MMMA prohibits the existence of medical marijuana dispensaries. Rather, it merely makes it difficult to conceive how such a dispensary would operate:

> [T]he operation of a dispensary would make little economic sense, because in order to abide by the provisions of the MMMA, the dispensary would have to be operated entirely by one individual, and could have, at most, five customers. This is because, first, the MMMA has no provision for the sale of marijuana, and, second, a primary caregiver is permitted to receive compensation only for the costs associated with assisting a qualifying patient to whom he or she is connected through registration with the [Department of Community Health]. [*People v Redden*, 290 Mich App 65, 108 n 15; 799 NW2d 184 (2010).]

[12] Such freewheeling arrangements are more akin to marijuana dispensaries in states that have legalized the recreational use of marijuana. See Dorbian, *Entrepreneurs Seek Profits from Pot*, Wall Street Journal (February 3, 2014); see also *McQueen*, 493 Mich at 148-149 ("In contrast to

(2013) ("[Immunity under the MMMA] does not extend to a registered primary caregiver who transfers marijuana for any purpose other than to alleviate the condition or symptoms of a specific patient with whom the caregiver is connected through the [Michigan Department of Community Health's] registration process.") (footnote and emphasis omitted).[13]  Instead, the MMMA only permits—and has always only permitted—the sale or transfer of marijuana from a registered caregiver to a patient to whom the caregiver is authorized to provide marijuana.[14] *People v Bylsma*, 493 Mich 17, 27-29; 825 NW2d 543 (2012).  This is to ensure that the marijuana is used for a medical purpose and to promote an ongoing relationship between patient, doctor, and caregiver.  *People v Hartwick*, 303 Mich App 247, 260-262; 842 NW2d 545 (2013), aff'd in part and rev'd in part 498 Mich 192 (2015).

In this case, the evidence clearly and dispositively shows that G3, from its inception, sold marijuana to individuals who: (1) filled out an application; and (2) provided a doctor's certificate, driver's license, and MMMA registration card.  Indeed, after receiving this documentation, defendants sold marijuana to the deputy who, to defendant, must have been a stranger who walked in off the street and requested marijuana.

As such, defendants obviously were not connected with the deputy through the Department of Community Health's registration process and were not his authorized caregivers. *McQueen*, 493 Mich at 156.  Moreover, defendants' conduct with the deputy—while reason enough for their prosecution—was not an isolated incident: the evidence showed that defendants, through G3, sold marijuana to other customers and even advertised its services on the internet *before* the deputy began his investigation.  Again, it is therefore impossible for the police to have induced defendants "to commit a crime" because defendants were already committing crimes when the sheriff's deputy applied to be a member of G3 and purchase marijuana.  *Johnson*, 466 Mich at 498.  The crux of the trial court's holding—"if the [deputy] had been a legitimate medical marijuana patient, and was only receiving his supply of marijuana from the defendants, the MMMA would have shielded them from prosecution"—is simply incorrect.

The trial court also misapplied the law when it held that the deputy entrapped defendants by use of "forged" documents.  As noted, the deputy's use of "deceit"[15] to expose an ongoing

_____

several other states' medical marijuana provisions, the MMMA does not explicitly provide for businesses that dispense marijuana to patients.") (footnote omitted).

[13] Again, though *McQueen* was decided in 2013, after the events relevant to this case, the decision applies retroactively.  *Johnson*, 302 Mich App at 466.

[14] Indeed, at the time of the police investigations, the MMMA did not even "permit[] the sale of marijuana," period—meaning that *all of defendants' operations were illegal before defendants ever interacted with the police*.  *McQueen*, 293 Mich App at 670.

[15] Were we nonetheless to accept the trial court's incorrect theorizing that defendants were entrapped by the deputy's so-called "fraudulent" documents, the documents used by the deputy to register for membership in G3 were accepted and seen by *one defendant*, and one defendant alone—Geer.  The record provides no basis to conclude that *any other* defendant was "misled" by the deputy's paperwork, in light of the fact that *he never presented it again* and merely used his G3 membership card and number to purchase marijuana in subsequent dealings.  Indeed, the

criminal enterprise is not entrapment—it is basic undercover police work. *Williams*, 196 Mich App at 663.[16] Moreover, as noted, our Court has held that precisely this sort of undercover police work to reveal the illegal operation of a marijuana dispensary is *not entrapment*. *Vansickle*, 303 Mich App at 117.

## VI. CONCLUSION

Accordingly, the trial court's improper dismissal of this case cannot stand. Its holding is reversed, and we remand for entry of an order reinstating the charges and dismissing defendants' claims of entrapment. We do not retain jurisdiction.

/s/ Henry William Saad

---

other defendants presented no evidence to show they reviewed the deputy's "fraudulent" paperwork or relied on it at any time.

As noted, it is impossible for Geer, as a matter of law, to have been "entrapped" by the deputy's "fraudulent" paperwork. It is impossible for the remainder of the defendants, as a matter of common sense, to have been "entrapped" by the deputy's "fraudulent" paperwork because they *never reviewed or relied on it.*

[16] The trial court also incorrectly held that, but for the deputy's conduct, the defendants could have asserted a defense under § 8 of the MMMA. However, defendants *did* assert a § 8 defense under the MMMA—which the trial court circumvented by truncating defendants' § 8 hearing and holding that defendants were "entrapped" by the police. See *Kolanek*, 491 Mich at 412. Of course, when the charges against defendants are reinstated, defendants may raise the § 8 affirmative defense if they so choose.

-9-