# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JASON DONALD JOHNSON,

        Defendant-Appellant.

UNPUBLISHED
July 28, 2016

No.  326504
Gratiot Circuit Court
LC No.  14-007022-FH

Before:  STEPHENS, P.J., and SERVITTO and GLEICHER, JJ.

PER CURIAM.

Defendant, Jason Johnson, pleaded guilty to two counts of the illegal sale of medical marijuana under § 4 of the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.* This Court initially denied Johnson's application for leave to appeal, *People v Johnson*, unpublished order of the Court of Appeals, entered April 30, 2015 (Docket No. 326504), but the Supreme Court remanded for review as on leave granted.  *People v Johnson*, 498 Mich 900; 870 NW2d 572 (2015).  A careful review of the record reveals that Johnson was entrapped as a matter of law.  The trial court clearly erred in finding to the contrary.  Accordingly, we reverse the lower court's ruling on the entrapment motion and vacate Johnson's plea-based convictions.

## I.  FACTS

This case began when the Mid-Michigan Area Group Narcotics Enforcement Team (MAGNET) began investigating Corey Telfor.  Telfor was a medical-marijuana caregiver and patient, but MAGNET's search of his home uncovered an impermissible amount of marijuana. Detective Eric Leonard offered Telfor an opportunity to mitigate the legal consequences against him by assisting with controlled drug buys on MAGNET's behalf.  Telfor agreed.

At the preliminary examination, Telfor described that he suggested Johnson as a possible target.  The two worked together at a manufacturing facility, but in different departments.  Telfor knew that Johnson was a medical marijuana patient.  No MAGNET officer instructed Telfor how to approach his target or "explain[ed] . . . what [he was] allowed to say to [Johnson] in terms of enticing him to sell [him] marijuana."  Detective Leonard added that beyond understanding that Telfor and Johnson worked for the same employer, he did not inquire into the nature of their relationship.

-1-

Johnson testified at his entrapment motion hearing that Telfor approached him to discuss the purchase of marijuana in August or September 2013 and that Telfor requested marijuana from him "15 to 25 times in the next two to three weeks." Telfor allegedly told Johnson that he was a caregiver, but his "crop" had failed and he was worried about losing his patients' business. Johnson felt "uncomfortable" about the transaction, but Telfor informed him that one patient can sell to another as long as the quantity is 2.5 ounces or less.[1] Tipping the scales, however, was Telfor's promise to assist Johnson in securing a promotion.

Johnson had been hired as a production line worker in February 2013. His $10.40 hourly wage made it difficult to support his family of four. Telfor was a supervisor in the welding department. An entry-level welder earns more than $4 an hour over a linesman's wage, and there was room for advancement in the welding department. Telfor agreed to meet Johnson every day in the shop before work to teach him welding. Telfor told Johnson, "[I]f [you] take care of [me], [I will] take care of [you]." Johnson interpreted this to mean that Telfor's assistance was conditioned on Johnson providing marijuana when requested.

Johnson described that he felt "very pressured" and as if he had "no choice." Accordingly, on October 17, 2013, he sold Telfor a small amount of marijuana. Shortly thereafter, company management summoned Johnson to a meeting. Telfor was present and Telfor's boss informed Johnson that if he continued to practice welding, he could move into that department as soon as a position became available. On December 3, Johnson complied with Telfor's request to sell him another small quantity of marijuana. Telfor subsequently invited Johnson to join him ice fishing on two occasions. Johnson came to view Telfor as a "good friend." In February 2014, the promised promotion came to pass and Johnson joined the welding department. He made one more sale to Telfor on February 19, claiming he felt "obligated" as Telfor controlled his future advancement.

Corroborating Johnson's version of events were Telfor's recorded conversations with Johnson during the controlled buys. During the second and third buys, the men discussed Johnson's promotion, and during the third, Johnson clarified that the sale was "patient to patient." Another coworker, Dillon Reeves, testified at the hearing that Telfor hired him into the company as a welder. During the relevant time period, Reeves injured his back and Telfor asked him if the doctor prescribed "good pills" for the pain. Reeves, uncomfortable with this exchange, lied and answered in the negative. Johnson's attorney subpoenaed Reeves to testify at the entrapment hearing. He appeared in court on September 9, 2014, but the hearing was continued without taking testimony. Reeves again appeared on September 12 and testified as anticipated. In the meantime, company management informed Reeves that he had been bypassed for a promotion he had applied for.

Based on the three controlled buys, the prosecution charged Johnson with three marijuana delivery counts. As noted, following the preliminary examination, Johnson filed a motion for dismissal, arguing that he "was entrapped, as a matter of law, by . . . MAGNET, and their

---

[1] Telfor claimed that Johnson actually gave him this information. Telfor asserted that he knew this statement to be incorrect.

confidential informant." Following the evidentiary hearing, the trial court denied this motion. A month later, Johnson pleaded guilty to reduced charges connected to the controlled buys on October 17 and December 3, 2013. The plea allowed Johnson to serve his jail sentence on the weekends so he could continue working.

## II. ANALYSIS

When a criminal defendant enters an unconditional guilty plea, as in this matter, the general rule is that he waives claims of error. The general rule is not always true, however. When a defendant raises a timely entrapment claim in the trial court, the claim is not deemed waived by the plea. See *People v Crall*, 444 Mich 463, 464-465; 510 NW2d 182 (1993); *People v White*, 411 Mich 366, 387; 308 NW2d 128 (1981). Johnson claimed before the trial court that prosecution could not be pursued under the MMMA because law enforcement entrapped him into committing the charged offenses. This contention was not waived by entry of Johnson's plea and we review its merit as preserved on appeal.

The defendant bears the burden of establishing entrapment by a preponderance of the evidence. *People v Woods*, 241 Mich App 545, 554; 616 NW2d 211 (2000).

> Whether entrapment occurred is determined by considering the facts of each case and is a question of law for this Court to decide de novo. The trial court must make specific findings regarding entrapment, and this Court reviews its findings under the clearly erroneous standard. The findings are clearly erroneous if this Court is left with a firm conviction that a mistake was made. [*People v Fyda*, 288 Mich app 446, 456; 793 NW2d 712 (2010).]

Entrapment is "the 'conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for trickery, persuasion, or fraud of the officer.' " *People v Jamieson*, 436 Mich 61, 68; 461 NW2d 884 (1990), quoting *Sorrells v United States*, 287 US 435, 454; 53 S Ct 210; 77 L Ed 413 (1932). Entrapment occurs when an officer goes beyond "furnish[ing] an opportunity for the commission of a crime by one ready and willing to commit the activity." *Jamieson*, 436 Mich at 68. "Michigan has adopted a modified objective test when analyzing entrapment," which takes into consideration police conduct as well as the defendant's "vulnerabilities." *People v Akhmedov*, 297 Mich App 745, 752-753; 825 NW2d 688 (2012). As repeatedly described by Michigan courts, "Entrapment occurs if (1) the police engage in impermissible conduct that would induce an otherwise law-abiding person to commit a crime in similar circumstances or (2) the police engage in conduct so reprehensible that the court cannot tolerate it." *Fyda*, 288 Mich App at 456.

When determining whether the police engaged in impermissible conduct that would induce an otherwise law-abiding citizen to commit a crime in similar circumstances, we must consider several factors outlined in *People v Johnson*, 466 Mich 491, 498-499; 647 NW2d 480 (2002):

> (1) whether there existed appeals to the defendant's sympathy as a friend, (2) whether the defendant had been known to commit the crime with which he was

charged, (3) whether there were any long time lapses between the investigation and the arrest, (4) whether there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen, (5) whether there were offers of excessive consideration or other enticement, (6) whether there was a guarantee that the acts alleged as crimes were not illegal, (7) whether, and to what extent, any government pressure existed, (8) whether there existed sexual favors, (9) whether there were any threats of arrest, (10) whether there existed any government procedures that tended to escalate the criminal culpability of the defendant, (11) whether there was police control over any informant, and (12) whether the investigation was targeted.

Here, the alleged entrapment was perpetrated through Telfor. Telfor clearly played upon his friendship with Johnson in convincing Johnson to sell him marijuana. Telfor selected Johnson as his target and expanded their relationship by spending time training Johnson in welding and taking him fishing. Telfor even introduced Johnson to his father and young son, entrusting Johnson to fish alone with the child. Using this purposefully-forged relationship, Telfor could lull Johnson into believing that his friend would not steer him into an illegal situation and therefore correctly told him that such "patient to patient" transfers were legal.

Moreover, Johnson had not been known to sell marijuana in the past. According to the sentencing transcript, Johnson's prior record consisted only of an old misdemeanor charge for driving with a restricted license and an old conviction for driving under the influence of alcohol. Telfor chose to target Johnson not because he was a known drug dealer or even because he dabbled in small transfers to friends. Rather, Telfor felt trapped by MAGNET to find someone, anyone to snare to avoid his own criminal consequences and knew that Johnson was a medical marijuana patient. Telfor knew that Johnson possessed medical marijuana, although the possession was legal. The result of MAGNET's method was to use a minnow to spawn and capture an even smaller fish.

The controlled buys were spread out over a four-month period. However, there was no real lapse between the third sale and Johnson's arrest. Accordingly, *Johnson*'s third factor does not weigh in the current defendant's favor.

The trial court rejected that "there existed any inducements that would make the commission of a crime unusually attractive to a hypothetical law-abiding citizen" under *Johnson*'s fourth factor. This was clear error. Viewing this factor in a vacuum, we might agree that promises of a higher paying job would not suffice. However, Telfor also made "guarantee[s] that the acts alleged as crimes were not illegal." And the crimes were not escalated to a serious level; the sales were all below 2.5 ounces.

"The circumstances of the particular defendant may be considered by the trial court in analyzing the ready and willing component of the objective entrapment test . . . ." *People v Juillet*, 439 Mich 34, 55; 475 NW2d 786 (1991). Johnson has a wife and two children to support, yet he was earning only $10.40 an hour on the production line. The additional $4.10 or $4.20 an hour as a welder was "a lot of stress relief" to Johnson's family. Johnson was able to pay off expenses incurred for his father-in-law's funeral and work toward buying a newer, safer vehicle for his wife. He secured contact lenses for one son and orthodontic treatment for the

-4-

other. Johnson was able to purchase nicer clothing for his children so they would be "more presentable at school" and took the family camping. Johnson did not seek out advancement at work to live a lavish lifestyle. Johnson's promotion essentially brought the family above the poverty line.

Yet, Telfor made Johnson's promotion conditional on Johnson's provision of marijuana when Telfor was short of marijuana requested by his medical marijuana patients. To secure training and a good word from Telfor, the welding supervisor, Johnson had to cooperate. To sweeten the enticement, Telfor convinced Johnson that he was savvy of the law as a medical marijuana caregiver. Telfor explained to Johnson that it is legal for a caregiver to offload marijuana to another caregiver when his stores exceed the legal limit and that patients may transfer small amounts to other patients. Johnson attempted his own research and believed Telfor spoke the truth. Given the unclear language of the MMMA in this ever-evolving legal arena, we do not doubt Johnson's confusion.

Once convinced, Johnson only provided small quantities below the allegedly-legal 2.5-ounce limit to Telfor. Johnson did not provide the marijuana for improper use. The medical marijuana was provided so Telfor could supply his existing patients or meet his own medical needs in the face of a marijuana plant die-off. And Johnson felt obligated to continue to satisfy Telfor's requests once Telfor became his supervisor in the welding department and held Johnson's job security in his hands.

The confidential informant was also very motivated to secure an arrest in this case by any means possible, supporting the presence of excessive government pressure under factor (7). Telfor was acting under threat of arrest. Law enforcement forced Telfor to locate targets on his own to secure the benefits of cooperation. Compare *Fyda*, 288 Mich App at 459 (where no entrapment occurred when the informant approached police not only to secure a personal benefit but also to prevent the murder of his friend's wife). Although the police controlled Telfor by meeting with him before and after the controlled buys and recording the conversation during the buys, law enforcement left Telfor completely on his own regarding his method of targeting, approaching, and luring others into his trap. Compare *id.* at 459-460 (where the officer monitored the informant's conversations with the defendant and "gave [the informant] specific instructions on how to approach and talk to" the defendant). The excessive pressure placed on Telfor, along with law enforcement's lax instruction and supervision, virtually guaranteed that Telfor would use improper and illegal methods to nab his coworker and friend. As MAGNET, acting through Telfor, led an otherwise law-abiding citizen to commit a crime through undue pressure, we conclude that Johnson was entrapped a matter of law.

We therefore reverse the trial court's entrapment decision and vacate Johnson's plea-based convictions.

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher