# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JAMAR DAVON OLIVER,

      Defendant-Appellant.

UNPUBLISHED
May 22, 2018

No. 339826
Ingham Circuit Court
LC No. 16-000859-FC

Before: METER, P.J., and GADOLA and TUKEL, JJ.

PER CURIAM.

Defendant, Jamar Davon Oliver, appeals as of right his jury-trial convictions of unlawful imprisonment, MCL 750.349b(1), and assault by strangulation, MCL 750.84(1)(b). Defendant was sentenced as a third-offense habitual offender, MCL 769.11, to concurrent terms of imprisonment of 12 to 30 years for unlawful imprisonment and 12 to 20 years for assault by strangulation. We affirm.

Ashley Austin testified that she and defendant began dating in August 2015. Sometime before September 4, 2016, Austin falsely told defendant that she was moving to Georgia. On September 4, 2016, Austin went to defendant's mother's home[1] to say a final goodbye to defendant because she wanted to discontinue contact with him. Austin and defendant watched television, had dinner, and had consensual sexual intercourse. Austin testified that the next morning, defendant became angry and held her against her will, sexually assaulted her several times, and thwarted her attempts to escape by hitting, kicking, and choking her and saying, "b*tch, you're not going anywhere[.]" Defendant was charged, in addition to the offenses of which he was convicted, with four counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1); however, the jury acquitted him of these charges.

Defendant first argues that there was insufficient evidence to support his unlawful-imprisonment conviction and that the trial court erred in denying his motion for a directed verdict on this charge. We do not agree.

---

[1] The record does not indicate where defendant's mother was during the criminal episode. There is no indication that she was present in the home during the incident.

-1-

The pertinent standards governing review of a motion for a directed verdict and a challenge to the sufficiency of the evidence are the same. See *People v Chelmicki*, 305 Mich App 58, 64; 850 NW2d 612 (2014), and *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "When ascertaining whether sufficient evidence was presented at trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt." *People v Passage*, 277 Mich App 175, 177; 743 NW2d 746 (2007). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Id*.

The unlawful-imprisonment statute, MCL 750.349b(1), provides, in relevant part:

(1) A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:

(a) The person is restrained by means of a weapon or dangerous instrument.

(b) The restrained person was secretly confined.

(c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony.

Defendant argues that evidence presented at trial was not sufficient to support his conviction of unlawful imprisonment because he did not "restrain" Austin and she was "free to leave" during the incident. MCL 750.349b(3)(a) defines the term "restrain" as follows:

"Restrain" means to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts.

Austin testified that she went to sleep and awoke to defendant yelling at her and kicking her in her ribcage. She stated that she ran toward a door to leave, but that defendant ran after her, moved her hand, and slammed the door shut, stating, "you're not going anywhere, b*tch." She stated that she again tried to unlock the door and that defendant hit her and ordered her to sit in the living room. The crime of unlawful imprisonment can occur when the victim is confined or her movement is restricted for even a moment. *Chelmicki*, 305 Mich App at 70. A factfinder could find that defendant forcibly restricted Austin's movements by stopping her from leaving the home, slamming the door shut before she could leave, moving her hand away from the door, hitting her, and ordering her back to the living room.

Austin stated that defendant subsequently forced his penis into her mouth and then choked her. When he let go, she ran for the door and managed to open the door, but defendant slammed it shut. Austin stated that defendant admonished her, punched her to the ground, and

-2-

again ordered her back to the living room. This is a second instance from which a factfinder could find that defendant forcibly restricted Austin's movements.

Austin stated that while she was standing in the living room, defendant pushed her to the ground and then climbed on top of her and vaginally penetrated her with his penis. Austin again tried to run to the door to leave, but defendant ran to the door and stopped her, stating, "I told you you're not leaving, get the f*ck back in the living room." Austin stated that she asked to leave and that defendant ordered her upstairs. A factfinder could find that defendant forcibly restricted Austin's movements during this sequence of events.

Austin testified that defendant forced her into a bedroom upstairs and onto a bed, where he performed nonconsensual oral sex on her. Austin stated that she attempted to sit up and stop him, but he pushed her down. This is yet another instance from which a factfinder could find that defendant restricted Austin's movements, i.e., by pushing her down.[2]

Defendant alleges that Austin was free to leave during the night, and that he did not restrain, hit, or kick her. We note that the prosecution introduced photographs of Austin that evidenced injuries consistent with the allegations she made that defendant used force against her to restrain her movements. A Sexual Assault Nurse Examiner (S.A.N.E.), Jill Hicks, testified that she observed Austin's injuries after the incident and that they were consistent with strangulation. "Circumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime." *Passage*, 277 Mich App at 177. "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*. Despite defendant's testimony to the contrary, a factfinder could reasonably have found, on the basis of Austin's testimony and the additional circumstantial evidence, that defendant forcibly restricted Austin's movements without her consent at numerous points during the morning of September 5, 2016.

Defendant argues that his acquittal of CSC-I means that he did not restrain Austin for the purpose of facilitating the commission of another felony. We note, however, that a conviction of the "other" felony is not a condition precedent for a conviction of unlawful imprisonment under the plain language of MCL 750.349b(1)(c), which states in part that a defendant commits unlawful imprisonment when he or she restrains a person to facilitate[3] the commission of another felony.[4] While there was an eventual acquittal[5] regarding CSC-I, the fact remains that there was *sufficient evidence presented* that defendant restrained Austin to *facilitate* committing CSC-I.

---

[2] Austin testified that defendant subsequently penetrated her vagina again with his penis, while she cried.

[3] The statute does not define "facilitate." In criminal law, "facilitate" means "[t]o make the commission of (a crime) easier." *Black's Law Dictionary* (10th ed).

[4] The jurors were instructed solely on this "other felony" theory of unlawful imprisonment, which is found at MCL 750.349b(1)(c).

Austin testified that after defendant restrained her, he commanded her to "suck my d*ck, b*tch." A factfinder could have reasonably found that defendant manifested his felonious purpose for restraining Austin by having her perform oral sex on him after restraining her movements. Austin stated that she attempted to leave again but that defendant stopped her, knocked her to the ground, and vaginally penetrated her with his penis. A factfinder could have used this evidence to find that defendant's purpose in restraining Austin was to commit another criminal sexual assault. Austin testified that she again attempted to leave, but defendant stopped her, ordered her upstairs, and performed oral sex on her, pushing her down when she attempted to get up. This is yet another instance from which a factfinder could find that defendant's motivation in restraining Austin was to make committing sexual assault on Austin easier.

In sum, the prosecutor presented sufficient evidence to support the unlawful-imprisonment conviction.

With regard to defendant's argument about a directed verdict, we note that defendant's acquittal of CSC-I quite clearly has no bearing on this Court's review of the trial court's decision to deny that motion, given that this Court is to review the trial court's ruling based on the evidence presented by the prosecution up until the directed-verdict motion is made. *People v Schultz*, 246 Mich App 695, 702; 635 NW2d 491 (2001). Moreover, "[a] directed verdict is appropriate only when no factual question exists on which reasonable jurors could differ." *Diamond v Witherspoon*, 265 Mich App 673, 681; 696 NW2d 770 (2005). In the present case, reasonable jurors could have differed regarding whether defendant restrained Austin to facilitate committing CSC-I. Because a rational trier of fact could have found that defendant restrained Austin to facilitate the commission of a felony, the trial court properly denied defendant's motion for a directed verdict. *Chelmicki*, 305 Mich App at 64.

Defendant next argues, in a brief filed pursuant to Michigan Supreme Court Administrative Order 2004-6, Standard 4, that Hicks should not have been qualified as an expert in strangulation because she did not possess sufficient medical qualifications. Defendant also contends that the prosecution violated MCR 6.201 by not providing him with an expert-witness curriculum vitae (CV) to establish that Hicks had a "sufficient training background in strangulation" before trial.

Appellate courts review for an abuse of discretion a trial court's decision to admit or exclude expert testimony. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). This Court also reviews for an abuse of discretion a trial court's decision regarding an expert's qualifications. *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009). A trial court abuses its discretion when it "chooses an outcome falling outside [the] principled range of outcomes." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

MRE 702 provides:

---

[5] This Court has noted that a jury sometimes will acquit on certain charges out of "lenien[cy] or compromise[]." *People v Davis*, 320 Mich App 484, 491; 905 NW2d 482 (2017).

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"[R]eference in MRE 702 to 'scientific' evidence 'implies a grounding in the methods and procedures of science,' and the rule's reference to 'knowledge' 'connotes more than subjective belief or unsupported speculation.' " *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004) (citation omitted). An expert witness may offer an opinion only if he or she has specialized knowledge that will assist the trier of fact in understanding the evidence. See *People v Petri*, 279 Mich App 407, 416; 760 NW2d 882 (2008). "The determinative inquiry in qualifying an expert is the nature and extent of knowledge and actual experience . . . ." *People v Christel*, 449 Mich 578, 592 n 25; 537 NW2d 194 (1995) (quotation marks and citation omitted).

MRE 702 provides that an expert may be qualified "by knowledge, skill, experience, training, or education[.]" The attorneys conducted extensive examinations concerning Hicks's qualifications. Hicks testified that she worked as a S.A.N.E. for the Sparrow Hospital Health System in Lansing. She testified that a S.A.N.E. is a "specialized nurse that is trained . . . to take care of a sexual assault victim that presents to the hospital." Hicks testified that during the course of her job, she conducts a sexual-assault-specific medical examination of the alleged victim, assists with evidence collection, and takes care of the victim's medical needs. Hicks testified that she held a S.A.N.E. certification, which required her to be a fully licensed nurse and to complete an additional 40 hours of adult training, an additional 40 hours of pediatric training, and a six-month orientation period with an experienced nurse examiner. Hicks testified that she had been a S.A.N.E. for 2½ years and had conducted approximately 238 examinations during that time. She stated that she had also been through additional specialized training with sexual-assault victims and additional training regarding strangulation. She testified:

It's training specifically on strangulation, the different structures of the anatomy of the neck, injuries that can occur that aren't always visually seen. We have to be able to evaluate a patient without seeing injuries present. Not all patients come in with an actual bruise or mark on them so we have to do additional training, so it includes ALS lighting, looking for bruising that may not be present on the skin but by turning off the lights and using specialized ALS lighting you can see trauma that had occurred that may not be present to the naked eye without the lights on.

Hicks testified that the strangulation training built upon her existing knowledge of the anatomy of the human body. Hicks testified that her training included looking at people who had been strangled. She also stated that she had been previously qualified as an expert in strangulation in a court proceeding in Ingham County. The prosecutor offered Hicks as an expert in strangulation "as far as it goes to the physical makeup of it and detecting [the] marks and the effects of strangulation."

Hicks was qualified to provide expert testimony related to the mechanics of strangulation in light of her testimony regarding her experience, knowledge, and training in the area of nursing, and her specialized training in strangulation. Further, she testified within the limitations of her experience, knowledge, and training. Hicks described the injuries to Austin's neck by noting abrasions and petechiae. Hicks stated that the abrasions and petechiae were consistent with strangulation. Before making these statements, Hicks described her training and experience in identifying marks consistent with strangulation and laid a proper foundation for her testimony that she believed Austin's marks were consistent with markers of strangulation she studied and had previously seen. Contrary to defendant's assertion, Hicks did not testify that Austin was choked, but that the physical injuries she suffered were consistent with the act of strangulation. MRE 702. Therefore, the trial court did not abuse its discretion by allowing Hicks to be qualified as an expert in recognizing marks consistent with strangulation or by admitting her testimony.

Defendant also argues that the prosecutor did not comply with MCR 6.201 because he did not provide defendant with Hicks's CV before trial. MCR 6.201(3) provides in pertinent part that in addition to other disclosures required by law, a party upon request must provide to all other parties "the curriculum vitae of an expert the party may call at trial and either a report by the expert or a written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion[.]" However, the record does not show that defendant ever requested Hicks's CV.[6] In addition, the record indicates that Hicks's CV and S.A.N.E. report were both introduced into evidence, and defense counsel participated in the voir dire examination of Hicks. Given all the circumstances, we find no basis for reversal with regard to the trial court's admission of Hicks's testimony.[7]

Finally, defendant challenges his sentence for assault by strangulation, arguing that 50 points should not have been assessed for offense variable (OV) 7 on the basis of sadism. We disagree and conclude that a preponderance of the evidence presented at trial supported the trial court's assessment of 50 points for OV 7.

The trial court's factual determinations regarding the scoring of the sentencing guidelines are reviewed for clear error and must be supported by a preponderance of the evidence. *People v Calloway*, 500 Mich 180, 184; 895 NW2d 165 (2017). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Johnson*, 466 Mich 491, 497-498; 647 NW2d 480 (2002). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Calloway*, 500 Mich at 184 (quotation marks and citation omitted).

---

[6] We note that Hicks was listed as a witness on the information filed against defendant.

[7] Defendant appears to be arguing that an error requiring reversal occurred because Hicks testified about additional training beyond that listed on her CV. Defendant provides inadequate support for such an argument.

Michigan's sentencing guidelines are advisory in all cases. *People v Steanhouse*, 500 Mich 453, 470; 902 NW2d 327 (2017). However, " '[s]entencing courts must . . . continue to consult the applicable guidelines range and take it into account when imposing a sentence . . . [and] justify the sentence imposed in order to facilitate appellate review.' " *Id.*, quoting *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "The sentencing offense determines which offense variables are to be scored in the first place, and then the appropriate offense variables are generally to be scored on the basis of the sentencing offense." *People v Sargent*, 481 Mich 346, 348; 750 NW2d 161 (2008). "The primary focus of the offense variables is the nature of the offense[.]" *Id.* "A sentencing court may consider all record evidence before it when calculating the guidelines, including, but not limited to, the contents of a presentence investigation report, admissions made by a defendant during a plea proceeding, or testimony taken at a preliminary examination or trial." *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012) (quotation marks and citation omitted). Reasonable inferences that arise from the record evidence may also be used to support the scoring of a variable. *People v Earl*, 297 Mich App 104, 109; 822 NW2d 271 (2012).

Under MCL 777.37(1)(a), OV 7 is to be assessed at 50 points if "[a] victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(3) defines "sadism" as "conduct that subjects a victim to extreme or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification."

In *People v Urban*, 321 Mich App 198, 217-218; 908 NW2d 564 (2017), this Court held that OV 7 was properly scored at 50 points on the basis of sadism. The *Urban* Court concluded that the record contained "substantial evidence supporting the conclusion that [the] defendant's prolonged behavior was egregious and sadistic" where the defendant's "behavior appeared to be designed to keep [the victim] captive emotionally as well as physically and went beyond the elements of his crimes." *Urban*, 321 Mich App at 217. In *Urban*, the defendant

> confined [the victim] for 3½ to 4 hours[;] threatened her with guns[;] . . . assaulted her with his hands and feet, a liquor bottle, and a handgun[;] . . . choked and kicked her[;] . . . told her that she could not leave and that he was going to drink liquor and smoke cigarettes before he killed them both[;] . . . threatened to rape her[;] told her that she should have believed the stories he had told her of bad things he had done to other women[;] . . . struck her while she was in the fetal position and not responsive to him[;] . . . did not allow [the victim] to stand and would point the gun at her head when she resisted[;] . . . made her repeatedly load the gun, telling her that he wanted the bullet that killed him to have her fingerprints[; and] . . . forced [her] to put the gun in her mouth. [*Id*. at 217-218.]

"While [the victim] initially may not have believed [the] defendant's threats, the record [was] clear that by the time she made her escape she was convinced that [he] was serious and that her life was at risk." *Id*. at 217.

In this case, Austin testified that while her liberty and movement were restricted by defendant, defendant called her derogatory names; yelled at her; punched her; scratched her; pushed her down; ordered her to go to different parts of the home; tore off her shirt, bra, and

pants; and sexually assaulted her *four* times[8] during the course of the prolonged incident. In addition, Austin testified that at one point, her nose was bleeding, and that defendant choked her "to the point that [she] couldn't breathe." She stated, "I thought he was going to kill me." In light of all the evidence, we find no basis for reversal with respect to the scoring of OV 7.

Affirmed.

/s/ Patrick M. Meter
/s/ Michael F. Gadola
/s/ Jonathan Tukel

---

[8] While it is true that the jury did not convict defendant of CSC-I, it was the *trial court's* role to score the variables, and the court was only required to determine if a *preponderance of the evidence* supported the facts needed to assess 50 points under OV 7. *Calloway*, 500 Mich at 184.